[No. 84856-4.    En Banc.]

Argued June 16, 2011.    Decided November 21, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL LYNN SUBLETT, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. CHRISTOPHER LEE OLSEN, *Petitioner*.

*Jeffrey E. Ellis* (of *Oregon Capital Resource Center*), for petitioner Sublett.

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for petitioner Olsen.

*Jon Tunheim, Prosecuting Attorney,* and *Carol L. La Verne, Deputy,* for respondent.

¶1  C. JOHNSON, J. — In this consolidated case, petitioners raise several issues, some common to both cases and others specific to each. Petitioner Michael Sublett challenges his convictions for premeditated first degree murder and felony murder, arguing the trial court wrongfully denied severance. He also challenges the comparability of out-of-state convictions used to support his sentence as a persistent offender. Petitioner Christopher Olsen challenges his conviction for felony murder, raising claims regarding lesser included offense jury instructions and ineffective assistance of counsel. Both petitioners challenge the content of the accomplice liability jury instruction, and both claim a violation of their article I, section 22 trial rights occurred when the trial judge considered, in chambers and with counsel present, a question from the jury during its deliberations. The Court of Appeals rejected the issues raised. We affirm.

FACTS AND PROCEDURAL HISTORY

¶2  Petitioners Sublett and Olsen, along with a third person, April S. Frazier, were convicted of robbing and murdering victim Jerry Totten. Frazier had met Totten at an Alcoholics Anonymous meeting. Frazier needed housing, and Totten offered her the use of a trailer on his property. He also allowed her to use the laundry facilities within his own home. Frazier's boyfriend, Sublett, was generally wel-

come as well. Totten was generous in assisting Frazier, giving her gifts of money as well as a place to live, and treated her, in her words, as a granddaughter. Despite this, Frazier and Sublett began stealing from Totten in November 2006. In January 2007, the two took Totten's wallet, cell phone, and checkbook. In total, Frazier and Sublett stole over $51,000 from Totten.

¶3 Olsen was a friend of Frazier's. On January 29, 2007, Frazier and Sublett bailed Olsen out of jail, using $1,000 of Totten's money, after Olsen agreed to perform a "job" for them. The three went to a hotel and used methamphetamine. At this point in the story, the accounts differ.[1] According to Frazier, all three went to Totten's together. She knocked on the front door, and Totten let her in. She then went to the laundry room to finish her laundry, the alleged reason for the visit, and let Sublett and Olsen in through the adjacent back door. The two men proceeded to beat Totten with a baseball bat they took from the laundry room. Frazier heard Totten's moans but did not witness the violence herself. A forensic pathologist testified Totten died of manual strangulation.

¶4 According to Olsen, Frazier and Sublett left the hotel for a few hours. When they returned to pick up Olsen, they were agitated and angry. The three went to Totten's home. Totten was completely covered by blankets on a recliner when Olsen arrived, and Olsen was not sure whether the victim was alive or dead. He did not check. The three proceeded to loot Totten's home for valuables. At this point, the two stories merge back together.

¶5 Olsen was upset, and he and Sublett went for a drive to calm down. Olsen claims Sublett threatened him with a gun, saying Olsen worked for Sublett now. Frazier also testified that Sublett threatened Olsen with a gun both at

---

[1] Frazier agreed to testify against Sublett and Olsen in exchange for a plea deal. Sublett did not testify but generally denied the crimes. Olsen's testimony, to the extent that it differed from Frazier's, was uncorroborated, although consistent with his prior statements to investigators.

Totten's home and when they were back at the hotel. The following day, the three returned to Totten's home and moved his body. They put the body in the back of one of Totten's trucks that had a canopy and covered it with various boxes and stuffed animals. Olsen and Sublett then drove out to the Old Olympic Highway and abandoned the truck on an embankment.

¶6 Frazier confessed a version of this story to Elsie Pray-Hicks a few days later. Pray-Hicks reported the crime to police a week after that. Frazier and Sublett were arrested in Las Vegas, and Olsen was arrested in Olympia. Sublett and Olsen were charged with premeditated first degree murder and, alternatively, felony murder. The two, over Sublett's objection, were joined for trial.

¶7 During trial, Olsen submitted an irregular second degree manslaughter instruction that was refused by the court. He did not submit any other lesser included offense instructions, nor did he object to any of the instructions given. During its deliberations, the jury submitted a question regarding the accomplice liability instruction. Counsel met in chambers to consider the question and agreed to the court's answer telling the jury to reread the instructions. No objection was made to this procedure or the answer itself. The written question and answer were put in the record, but there was no colloquy regarding the discussion in the verbatim report of the proceedings.

¶8 Sublett was convicted of both premeditated first degree murder and felony murder. He was sentenced to life without the possibility of release under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570, based on prior out-of-state convictions found comparable to Washington strike offenses. Olsen was convicted of felony murder but not premeditated murder. He was sentenced to 500 months of confinement based on his offender score of 9. The Court of Appeals affirmed. In rejecting that a closure occurred, the Court of Appeals held that the right to a public trial does not extend to hearings on purely ministerial or legal issues that

do not require the resolution of disputed facts. Because the jury's question involved a purely legal issue, consideration of the inquiry was not subject to the right for a public trial, so the defendants' rights were not violated. This appeal followed.

Issues[2]

¶9  1. Whether the trial court erred by denying severance.

¶10  2. Whether the trial court violated the right to a public trial by considering a jury question in camera.[3]

¶11  3. Whether the accomplice liability instruction correctly stated the law.

¶12  4. Whether the trial court erred by refusing to specifically answer the jury's question.

¶13  5. Whether the trial court should have instructed the jury on lesser included offenses as to Olsen.

¶14  6. Whether Olsen received effective assistance of counsel given his counsel's failure to submit lesser included offense instructions.

¶15  7. Whether second degree robbery in California is comparable to Washington's second degree robbery for persistent offender purposes.

Analysis

1.  *Whether the trial court erred by denying severance*

¶16 A defendant seeking severance must demonstrate that a joint trial would be so manifestly prejudicial as

---

[2] Olsen's petition for review raises more issues, but rather than argue these in the petition, he attempts to incorporate his arguments below by reference. We do not address issues based solely on incorporated arguments. *State v. Brett*, 126 Wn.2d 136, 205, 892 P.2d 29 (1995) (citing RAP 10.3(a)(5) requirement that brief must include argument as well as citation to legal authority and citing *State v. Lord*, 117 Wn.2d 829, 916, 822 P.2d 177 (1991)).

[3] Both Sublett and Olsen argued their right to be present was violated by this procedure at the Court of Appeals but abandoned this issue in their petitions for review here. The Court of Appeals held the conference itself was not a critical stage of the proceedings because it involved purely legal issues and no disputed facts, so the right to be present did not apply and therefore was not violated.

to outweigh the concern for judicial economy. Whether to grant a motion to sever trials is left to the discretion of the trial court and is reversed on appeal only when a manifest abuse of discretion is shown. *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991) (citing *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982)). On appeal, the defendant must be able to point to specific prejudice. Mutually antagonistic defenses may be sufficient to support a motion to sever, but this is a factual question that must be proved and is not sufficient grounds in itself as a matter of law. *Grisby*, 97 Wn.2d at 508.[4] The conflict must be so prejudicial that the two defenses are irreconcilable, such that the jury will unjustifiably infer that the conflict alone demonstrates that both defendants are guilty. *Hoffman*, 116 Wn.2d at 74 (citing *Grisby*, 97 Wn.2d at 508).

¶17 Sublett's defense was a general denial of involvement in the murder. Sublett did not testify during trial. Olsen's defense was that he was not present for the murder, and he helped move the body after the fact only because Sublett threatened him. Sublett moved for severance so that he would not have to defend himself from both the State and Olsen. The Court of Appeals found that the trial court did not err by denying severance because the two defenses were not so prejudicially in conflict that the jury would infer guilt simply from the conflict, nor were the defenses so mutually exclusive that the jury would be forced to believe one if it disbelieved the other.

¶18 We have set a high bar for granting severance, and Sublett has not met it. While the two defenses are irreconcilable, they do not reach the level where the jury would unjustifiably infer *from the conflict* that both are guilty. *See Hoffman*, 116 Wn.2d at 74 (citing *Grisby*, 97 Wn.2d at 508). The jury could have believed either or neither defendant,

---

[4] Separate trials are required when an out-of-court statement by a codefendant incriminates his fellow defendant because that situation raises confrontation clause issues. *Grisby*, 97 Wn.2d at 507 (citing *State v. Ferguson*, 3 Wn. App. 898, 906, 479 P.2d 114 (1970)). Because Olsen testified and was subject to cross-examination, this is not at issue here.

though it could not believe both. That is, it could have believed that Sublett did not participate at all and inferred that Olsen was lying. Or it could have believed Olsen and inferred that Sublett was lying. Given the jury's verdict, it did not believe either of them, and Sublett has not shown that this was due to the conflicting defenses rather than the evidence presented during trial.[5] Nor did Sublett cite to any evidence admissible only as to Olsen, which prejudiced his defense. The trial court, therefore, did not err in denying severance.

2. *Whether the trial court violated the right to a public trial by considering a jury question in camera*

¶19 Both Sublett and Olsen contend that the trial court violated their public trial right when the court responded to a jury question in chambers, with only counsel present, and that this violation requires automatic reversal. Whether the right to a public trial has been violated is a question of law reviewed de novo. *State v. Momah*, 167 Wn.2d 140, 147-48, 217 P.3d 321 (2009) (citing *State v. Bone-Club*, 128 Wn.2d 254, 256, 906 P.2d 325 (1995)). There is a strong presumption that courts are to be open at all stages of the trial. A criminal defendant's right to a public trial is found in article I, section 22 of the Washington State Constitution and the Sixth Amendment to the United States Constitution, both of which provide a criminal de-

---

[5] Such a result is supported by federal case law as well. In a similar case, *Zafiro v. United States*, 506 U.S. 534, 538-39, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993), the defendants sought a bright line rule requiring severance whenever defendants presented antagonistic defenses. The Court denied the request but instead offered situations where joint trials would seriously compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. The examples given focused on evidence that would be admissible as to one defendant but inadmissible against another. Otherwise, limiting instructions are assumed to cure most risks of prejudice. Here, instruction 6 told the jury to "separately decide the count charged against each defendant" and that a "verdict on one count as to one defendant should not control your verdict on the other count or as to the other defendant." Olsen Clerk's Papers (OCP) at 54. This is the proper procedure to follow in these circumstances.

fendant with a "public trial by an impartial jury."[6] The public trial right is not absolute but may be overcome to serve an overriding interest based on findings that closure is essential and narrowly tailored to preserve higher values. *Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984).

¶20 Before determining whether there was a violation, we first consider whether the proceeding at issue implicates the public trial right, thereby constituting a closure at all. We recently held that a closure "occurs when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). But not every interaction between the court, counsel, and defendants will implicate the right to a public trial or constitute a closure if closed to the public.

¶21 To facilitate this determination, the Court of Appeals, relying on its earlier decision in *State v. Sadler*, 147 Wn. App. 97, 193 P.3d 1108 (2008) held that the right to a public trial does not extend to hearings on purely ministerial or legal issues that do not require the resolution of disputed facts. *State v. Sublett*, 156 Wn. App. 160, 181, 231 P.3d 231 (2010). The appellate court recognized that the public trial right extends to the evidentiary phases of trial and other adversary proceedings such as suppression hearings and jury selection (voir dire). There was no showing

---

[6] Additionally, article I, section 10 of Washington's Constitution provides that "[j]ustice in all cases shall be administered openly," granting both the defendant and the public an interest in open, accessible proceedings. *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 36, 640 P.2d 716 (1982). This right is mirrored federally by the First Amendment. *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (*Press* I). We have historically analyzed allegations of a court closure under either article I, section 10 or article I, section 22 analogously, although each is subject to different relief depending upon who asserts the violation. *See Press* I, 464 U.S. at 512 (transcript will remedy violation of public trial right asserted by member of public); *Ishikawa*, 97 Wn.2d at 45-46 (remanding for reconsideration of motion to unseal transcripts when violation asserted by member of public); *Waller v. Georgia*, 467 U.S. 39, 50, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (remanding for new suppression hearing when right asserted by defendant); *State v. Easterling*, 157 Wn.2d 167, 182, 137 P.3d 825 (2006) (remanding for new trial when right asserted by defendant excluded from proceeding).

here that the chambers discussion was adversarial in that it seems all sides agreed with the judge's response. Rather, because the jury's question involved a purely legal issue, consideration of the inquiry was not subject to the public trial right under this distinction, so the Court of Appeals found that defendants' rights were not violated. This analytical construct has gained acceptance in Court of Appeals cases. *See, e.g., In re Det. of Morgan,* 161 Wn. App. 66, 253 P.3d 394 (2011); *In re Det. of Ticeson,* 159 Wn. App. 374, 386, 246 P.3d 550 (2011); *State v. Koss,* 158 Wn. App. 8, 17-18, 241 P.3d 415 (2010), *petition for review filed,* No. 85306-1 (Wash. Nov. 16, 2010); *State v. Rivera,* 108 Wn. App. 645, 652-53, 32 P.3d 292 (2001). While we agree with the appellate court's result in this case and note the approach used by the Court of Appeals somewhat parallels the approach we use, we reject the Court of Appeals' formulation of the relevant inquiry. We decline to draw the line with legal and ministerial issues on one side, and the resolution of disputed facts and other adversarial proceedings on the other. The resolution of legal issues is quite often accomplished during an adversarial proceeding, and disputed facts are sometimes resolved by stipulation following informal conferencing between counsel. The distinction made by the Court of Appeals will not adequately serve to protect defendants' and the public's right to an open trial.

¶22 We have recognized that the right to a public trial serves to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury. *State v. Brightman,* 155 Wn.2d 506, 514, 122 P.3d 150 (2005) (citing *Peterson v. Williams,* 85 F.3d 39, 43 (2d Cir. 1996)). The appellate court concluded no public trial right violation occurred. We reach the same conclusion using the experience and logic test because we hold that resolution of the jury's question did not implicate the core values the public trial right serves.

¶23 Recognizing that resolution of whether the public trial right attaches to a particular proceeding cannot be

resolved based on the label given to the proceeding, in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (*Press* II), the United States Supreme Court formulated and explained the experience and logic test to determine whether the core values of the public trial right are implicated.[7] The first part of the test, the experience prong, asks "whether the place and process have historically been open to the press and general public." *Press* II, 478 U.S. at 8. The logic prong asks "whether public access plays a significant positive role in the functioning of the particular process in question." *Press II*, 478 U.S. at 8. If the answer to both is yes, the public trial right attaches and the *Waller* or *Bone-Club* factors must be considered before the proceeding may be closed to the public.[8] *Press* II, 478 U.S. at 7-8. We agree with this approach and adopt it in these circumstances.

¶24 The experience and logic test can be helpful in that it allows the determining court to consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors. For example, in *Press* II, the underlying case concerned preliminary hearings in Cali-

---

[7] The Court had already discussed the importance of access to criminal trials under the First Amendment in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604-06, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982), as recognized by both experience and logic. Because criminal trials were historically open and the right of access "plays a particularly significant role in the functioning of the judicial process and the government as a whole," the *Globe* Court required the State to identify a compelling government interest prior to closure and to narrowly tailor the denial of access to serve the interest. *Globe*, 457 U.S. at 606. *Globe* preceded *Press* I and *Waller* by two years.

[8] Before closing a proceeding to the public, the trial court is required to consider the following factors and enter specific findings on the record to justify any ensuing closure: (1) The proponent of closure must show a compelling interest, and if based on anything other than defendant's right to a fair trial, must show serious and imminent threat to that right; (2) anyone present when the motion is made must be given opportunity to object; (3) the least restrictive means must be used; (4) the court must weigh the competing interests of the proponent of the closure and the public; and (5) the order must be no broader in application or duration than necessary. *Bone-Club*, 128 Wn.2d at 258-59. These are consistent with the factors required by *Waller*, 467 U.S. at 47, although a recent decision, *Presley v. Georgia*, 558 U.S. 209, 214, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010), clarifies that the trial court must, sua sponte, consider reasonable alternatives to closure.

fornia, which are held before trial to determine whether probable cause exists to try the defendant. Such hearings, being similar in nature to probable cause hearings, have traditionally been open, therefore satisfying the first prong of the test, experience. Next, the Court considered the values served by open courts, that is, whether the logic prong dictated openness during such proceedings. Having previously found that public access to criminal trials is essential to the proper functioning of the criminal justice system, the Court compared the hearing at issue to the trial itself. It found that many of the same rights attached (the right to appear, to cross-examine hostile witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence); it commented on the importance of the hearing because it is often the final and most important step of the criminal proceeding; and it remarked that because there was no jury present to act as a safeguard, public access was even more significant. Therefore, the logic prong counseled toward a finding of openness. Because both prongs of the analysis were answered affirmatively, the Court held that the right of public access attached. For any closure to ensue, then, it would need to be justified by findings that it was essential to preserve higher values and narrowly tailored to serve that interest. *Press* II, 478 U.S. at 10-13.[9] But not every case will

---

[9] At issue in *Press* II was whether a newspaper could obtain transcripts of the proceeding, which the defendant had successfully moved the court to close to the public under a state statute. The release of transcripts was initially denied because it could result in prejudicial pretrial publicity, but after the defendant waived his right to a jury trial, the transcripts were released. Review of the matter was not moot because the controversy was capable of repetition, yet evading review. The remedy in *Press* II was not a new trial or release of the transcripts, but simply a reversal of the reasoning of the California Supreme Court because it had failed to consider the First Amendment right of access to criminal proceedings. *Press* II, 478 U.S. at 15. Though *Press* II involved the First Amendment, we see no reason not to apply the experience and logic test to determine the scope of protected rights under article I, section 22 of the Washington State Constitution. The Court has recognized in the context of juror selection proceedings that "there is no legitimate reason . . . to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has. 'Our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant.' " *Presley*, 558 U.S. at 213 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979)).

fit cleanly within a comparison between the proceeding at issue and trial in general, so the trial or reviewing court must consider whether openness will "enhance[ ] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 508, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) *(Press* I). We recognize the failure of any test to identify a closure with accuracy. However, the federal approach is a useful tool for determining whether the public trial right attaches to a particular process; we therefore apply it in this case.

¶25  In applying the experience and logic test to the facts before us, we find the petitioners have failed to establish that their right to a public trial was violated. The petitioners have not identified any case that holds that these proceedings are a closure or violate the defendants' constitutional rights, and we cannot find one either.[10] Because the jury asked a question concerning the instructions, we view this as similar in nature to proceedings regarding jury instructions in general. Historically, such proceedings have not necessarily been conducted in an open courtroom. Jury instructions are covered by CrR 6.15. Proposed instructions are submitted in writing at least three days before the start of trial. CrR 6.15(a). We are aware that, quite often, counsel discuss the instructions with the court during an informal proceeding. But before instructing the jury, counsel is to be given the opportunity to object in the absence of the jury. CrR 6.15(c). Any objections to the instructions, as well as the grounds for the objections, must be put in the record to

---

[10] Sublett cites one case where a Massachusetts appellate court held that "it was a violation of the defendant's right to a public trial for the judge to give her supplemental instructions to the jury in the privacy of the jury room," *Commonwealth v. Patry*, 48 Mass. App. Ct. 470, 475, 722 N.E.2d 979, 983 (2000), and argues this case supports his contention that the discussion regarding the question should also, therefore, be held in open court. But the judge and counsel in *Patry*, similar to the facts before us, discussed the jury question and the appropriate answer in private, and that discussion was held not to be in violation of the defendant's public trial right, so this case does not support Sublett's argument.

preserve review. *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 162-63, 795 P.2d 1143 (1990); *Goehle v. Fred Hutchinson Cancer Research Ctr.*, 100 Wn. App. 609, 615-17, 1 P.3d 579 (2000) (counsel has duty to lodge formal objections even if instructions discussed during informal hearing). Both CrR 6.15(a) and CrR 6.15(c) have been in effect, in almost identical form, since 1973. We have found no challenges to either of these sections of the rule or, prior to the rule's enactment, any case requiring the discussion of jury instructions to be held in open court.

¶26 The same is true regarding a proceeding to discuss a question from the jury about its instructions. Such questions from the jury are covered by CrR 6.15(f). This rule requires:

> (1) The jury shall be instructed that any question it wishes to ask the court about the instructions or evidence should be signed, dated and submitted in writing to the bailiff. *The court shall notify the parties of the contents of the questions and provide them an opportunity to comment upon an appropriate response. Written questions from the jury, the court's response and any objections thereto shall be made a part of the record. The court shall respond to all questions from a deliberating jury in open court or in writing.* In its discretion, the court may grant a jury's request to rehear or replay evidence, but should do so in a way that is least likely to be seen as a comment on the evidence, in a way that is not unfairly prejudicial and in a way that minimizes the possibility that jurors will give undue weight to such evidence. *Any additional instruction upon any point of law shall be given in writing.*

CrR 6.15(f) (emphasis added).[11] While the rule requires that the question itself, any objections, and the court's

---

[11] CrR 6.15(f)(1) has been in its present form since 2002. Before that, the rule contemplated that the court may wish to bring the jury into open court but did not require such a proceeding:

After retirement for deliberation, if the jury desires to be informed on any point of law, the judge may require the officer having them in charge to conduct them into court. Upon the jury being brought into court, the information requested, if given, shall be given in the presence of, or after notice to the parties or their

response be "made a part of the record," it does not state how this must be done. Given that the question is submitted in writing, the rule contemplates that the answer, and any objections, will also become part of the record in document form. It is, of course, within the court's discretion to read the question, ask for objections, and give an answer in open court with a court reporter present, but this is not required by CrR 6.15(f)(1). The rule itself advances and protects those interests underlying the constitutional requirements of open courts with its directive to put the question, answer, and objections in the record. This rule is the only authority we can find governing this process, so, historically, we conclude that a proceeding in open court to discuss the question itself and any appropriate answer has not been required.

¶27 Under the facts of this case, then, we find no closure occurred because this proceeding did not implicate the public trial right, and therefore there was no violation of either petitioners' public trial right. None of the values served by the public trial right is violated under the facts of this case. No witnesses are involved at this stage, no testimony is involved, and no risk of perjury exists. The appearance of fairness is satisfied by having the question, answer, and any objections placed on the record pursuant to CrR 6.15. Similarly, the requirement that the answer be in writing serves to remind the prosecutor and judge of their responsibility because the writing will become part of the public record and subject to public scrutiny and appellate review. This is not a proceeding so similar to the trial itself that the same rights attach, such as the right to appear, to cross-examine witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence. Neither Sublett nor Olsen claim or argue any of these rights, nor could they since such rights are inapplicable in the discussion of, or resolution of, ques-

---

counsel. Any additional instruction upon any point of law shall be given in writing.

Former CrR 6.15(f)(1) (1974).

tions from the jury. We hold the petitioners have not established that a closure or public trial right violation occurred.

### 3. Whether the accomplice liability instruction correctly stated the law

¶28 We review instructional errors de novo. *State v. Schaler*, 169 Wn.2d 274, 282, 236 P.3d 858 (2010) (citing *State v. Grande*, 164 Wn.2d 135, 140, 187 P.3d 248 (2008)). In doing so, we evaluate each instruction in the context of the instructions as a whole. *State v. Brett*, 126 Wn.2d 136, 171, 892 P.2d 29 (1995) (citing *State v. Benn*, 120 Wn.2d, 631, 654-55, 845 P.2d 289 (1993)). Olsen did not object to the instructions implicated by his argument, but he argues his due process rights were violated because the State was not required to prove every element of the offense; thus, according to his argument, reversal is warranted. *See In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). Under RAP 2.5(a)(3), we will review an alleged manifest error affecting a constitutional right even if not raised in the trial court. But for relief to be granted, Olsen must show actual prejudice resulting from the error, and the error is nonetheless subject to harmless error review. *State v. O'Hara*, 167 Wn.2d 91, 98-99, 217 P.3d 756 (2010).

¶29 Olsen argues that the jury instructions allowed for his conviction of felony murder even if, as according to his own testimony, Olsen arrived at the scene after the murder to participate in a second burglary. This theory relies on a novel approach to burglary: that a first burglary ended when Sublett and Frazier allegedly left the victim's home and a second began when the three returned to steal

more items.[12] Olsen argues the jury should have been instructed on this multiple-instance theory of burglary. Specifically, Olsen argues that the State arguably did not prove Olsen participated in *the* crime that felony murder was predicated upon because according to his testimony, he could have participated only in a separate, second burglary.[13] The Court of Appeals found that the instructions accurately stated the elements required for the jury to convict Olsen of felony murder.[14] We agree.

¶30 A person is guilty of felony murder when

[h]e or she commits . . . the crime of . . . robbery in the first or second degree, [or] burglary in the first degree . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.32.030(1)(c). The corresponding instruction given, instruction 11, provided that

---

[12] In support of this theory, Olsen cites *State v. Dennison*, 115 Wn.2d 609, 616, 801 P.2d 193 (1990), where we found that the burglary at issue was still in progress while the defendant was fleeing the scene, consonant with the felony murder statute. RCW 9A.32.030(1)(c) ("in the course of or in furtherance of such crime or in immediate flight therefrom, he or she . . . causes the death of a person other than one of the participants"). We did not consider whether, if the defendant had returned after fleeing, a second, chargeable burglary would have occurred, and need not do so for purposes of this discussion.

[13] In making this argument, Olsen relies on *State v. Cronin*, 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000) and *State v. Roberts*, 142 Wn.2d 471, 501-02, 14 P.3d 713 (2000), where we clarified that for accomplice liability to attach, the defendant must have knowledge of *the specific underlying crime* to be guilty as an accomplice, not simply knowledge of any crime, because we are not a strict accomplice liability state. The instructional problems addressed in *Roberts* and *Cronin* have been remedied by using "the crime" and "such crime" rather than "a crime" in jury instructions, and such was the case here. *See* OCP at 71 (Instruction 21) (accomplice liability instruction).

[14] The Court of Appeals rejected Olsen's arguments first because he did not object to the instructions but mainly because it believed there was no evidence that Totten was killed during the course of a crime that had terminated prior to Olsen's involvement. *Sublett*, 156 Wn. App. at 190-91 (citing *State v. Hunter*, 152 Wn. App. 30, 44, 216 P.3d 421 (2009)). This ignores Olsen's testimony that he arrived after the violent acts occurred, which, though perhaps not credible, was before the jury as evidence.

[a] person also commits the crime of murder in the first degree when he or she attempts to commit burglary in the first degree or robbery in the first or second degree, and in the course of and in furtherance of such crime or in immediate flight from such crime he or another participant causes the death of a person other than one of the participants.

Olsen Clerk's Papers (OCP) at 59. The instruction closely tracks the statute. A burglary is deemed to be "in progress" while the burglar is on the premises and continues during his flight. *State v. Dennison*, 115 Wn.2d 609, 616, 801 P.2d 193 (1990). According to Olsen, the effect of these instructions allowed the jury to convict him of felony murder even if the jury believed his version of events that there were actually two separate burglaries, the second occurring after Totten was murdered. Olsen's arguments fail because the instructions are subject to only one interpretation: that Olsen participated in *the* burglary upon which the felony murder was predicated. *See* OCP at 64 (Instruction 15) ("to convict" instruction).[15] Moreover, the accomplice liability instruction makes clear that "more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice." OCP at 71 (Instruction 21).[16] Importantly, these instructions allowed for acquittal if the jury believed Olsen's testimony, which they did not.

---

[15] The "to convict" instruction required finding, as felony murder, alternative B:

(1) That on or about January 29, 2007, Jerry Totten was killed; (2) That the defendant or an accomplice was committing or attempting to commit *the crime* of burglary in the first degree or robbery in the first or second degree; (3) That the defendant, *or another participant*, caused the death of Jerry Totten in the course of or in furtherance *of such* crime or in immediate flight from such crime; (4) That Jerry Totten was not a participant in the crime; and (5) That the acts occurred in the State of Washington.

Instruction 15, OCP at 64 (emphasis added).

[16] In full, the accomplice liability instruction provided:

A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for

¶31 Additionally, Olsen's arguments fail because we evaluate each instruction in the context of the instructions as a whole. *Brett*, 126 Wn.2d at 171 (citing *Benn*, 120 Wn.2d at 655). There is a defense available to a felony murder charge, and the jury was given that corresponding instruction:

It is a defense to a charge of murder in the first degree based upon committing Burglary or Robbery that the defendant:

(1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and

(2) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(4) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

This defense must be established by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defen-

---

the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

OCP at 71 (Instruction 21).

dant has established this defense, it will be your duty to return a verdict of not guilty.

OCP at 75 (Instruction 25). This instruction almost verbatim tracks the language of RCW 9A.32.030(1)(c). If the jury had believed Olsen's version of events, this instruction allowed for his acquittal. The State was not, therefore, relieved of its burden of proof because it had to prove Olsen participated in the burglary, which resulted in Totten's death and, given the available defense, in some way either committed or aided in the homicidal act. We affirm the Court of Appeals in finding no instructional error.

4. *Whether the trial court erred by refusing to specifically answer the jury's question*

¶32 As discussed above, the jury submitted a question during its deliberations concerning the accomplice liability instruction. *See* OCP at 75 (Instruction 21, note 10). The jury sent the following question to the trial court:

> Clarification of Instruction 21. The structure of the 2nd sentence in the 1st paragraph is unclear. Which of the following is correct for intent? A person (X) is legally accountable for the conduct of another person (Y) when he or she (X) is an accomplice of such other person (Y) in the commission of the crime.–OR— A person (X) is legally accountable for the conduct of another person (Y) when he or she (Y) is an accomplice of such other person (X) in the commission of the crime.

The judge and counsel discussed this question in chambers, and the judge responded to the jury that "I cannot answer your question please re-read your instructions." Sublett Clerk's Papers at 129.

¶33 It is within the trial court's discretion whether to give further instruction to a deliberating jury. *State v. Becklin*, 163 Wn.2d 519, 529, 182 P.3d 944 (2008) (citing *State v. Brown*, 132 Wn.2d 529, 612, 940 P.2d 546 (1997)). Because there was no objection, however, we do not review for abuse of discretion. Rather, Olsen must show

actual prejudice caused by a constitutional error. *O'Hara*, 167 Wn.2d at 98-99. He does not do so. The Court of Appeals found that the accomplice liability instruction was not ambiguous and could support only one reading and that reading was a correct statement of the law, thus there was no error. We agree.

¶34 Olsen argues that the second interpretation allowed the jury to convict him even if he lacked the mental state necessary for accomplice liability, therefore relieving the State of its burden to prove every element of the crime. But this section of the instruction does not touch upon the requisite mental state. The following paragraph requires knowledge: "A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he . . . aids or agrees to aid another person in planning or committing the crime." OCP at 71 (Instruction 21). Despite any potential confusion regarding who is aiding whom from the first part of the instruction, the jury still had to find Olsen *knew* his aid would facilitate the robbery or burglary. Therefore, there was no prejudice or error caused by not further instructing the jury.

5. *Whether the trial court should have instructed the jury on lesser included offenses as to Olsen*

¶35 We apply the *Workman* test to determine whether a defendant is entitled to an instruction on a lesser included offense. *State v. Huyen Bich Nguyen*, 165 Wn.2d 428, 434-35, 197 P.3d 673 (2008) (citing *State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978)). Under that test, two conditions must be met: first, each element of the lesser offense must be a necessary element of the offense charged. Second, the evidence must support an inference that the lesser crime was committed. We view the evidence in the light most favorable to the requesting party. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). First and second degree manslaughter may be lesser

included offenses to premeditated murder, but neither first nor second degree manslaughter is a lesser included offense to first degree felony murder. *State v. Warden*, 133 Wn.2d 559, 562-63, 947 P.2d 708 (1997); *Dennison*, 115 Wn.2d at 609, 626-27 (explaining mental elements required for manslaughter not required for felony murder).[17] Thus, the only avenue open to Olsen is an argument that he was entitled to a manslaughter instruction based on the premeditated murder charge.

¶36 Olsen argues that he was entitled to a second degree manslaughter instruction based on his failure to summon aid when he had a legal duty to do so. *See State v. Morgan*, 86 Wn. App. 74, 80, 936 P.2d 20 (1997).[18] Under RCW 9A.32.070(1), "A person is guilty of manslaughter in the second degree when, with criminal negligence, he causes the death of another person." Olsen relies on RCW 9.69.100, which creates a duty to report a violent offense, and criminalizes the failure to do so as a gross misdemeanor.[19] According to Olsen, Totten was kid-

---

[17] RCW 9A.32.060, manslaughter in the first degree, requires proof of recklessness, and RCW 9A.32.070, manslaughter in the second degree, requires proof of criminal negligence. Neither of these are present in the felony murder statute, which requires no proof of a criminal mental state other than that necessary for the predicate crime. *State v. Frazier*, 99 Wn.2d 180, 191-92, 661 P.2d 126 (1983) (citing *State v. Dudrey*, 30 Wn. App. 447, 450, 635 P.2d 750 (1981)).

[18] In *Morgan*, the Court of Appeals held that a statute criminalizing the willful refusal to provide medical assistance to one's spouse could support the recklessness element necessary for a manslaughter charge. Violation of that statute, similar to RCW 9.69.100 (failure to report), is a gross misdemeanor.

[19] RCW 9.69.100, in full, requires:

(1) A person who witnesses the actual commission of:
(a) A violent offense as defined in RCW 9.94A.030 or preparations for the commission of such an offense;
(b) A sexual offense against a child or an attempt to commit such a sexual offense; or
(c) An assault of a child that appears reasonably likely to cause substantial bodily harm to the child,
shall as soon as reasonably possible notify the prosecuting attorney, law enforcement, medical assistance, or other public officials.

(2) This section shall not be construed to affect privileged relationships as provided by law.

napped.[20] Because kidnapping is a violent offense, Olsen argues his failure to report Totten's kidnapping demonstrates his criminal negligence. *See* RCW 9.94A.030(45)(a) (vi) (defining "first degree kidnapping" as a serious violent offense), (54)(a)(vi) (defining "second degree kidnapping" as a violent offense). The failure to report, in turn, caused the death of Totten, so Olsen, under his theory, was therefore guilty of manslaughter. Olsen offered a nonstandard second degree manslaughter instruction based on this theory that the trial court refused.

¶37 We can find no support for Olsen's reading of the statutes. The legislature already decided that the failure to report under RCW 9.69.100 would be categorized and punished as a gross misdemeanor. We see no reason to elevate this crime to a felony. We therefore reject Olsen's argument that the failure to report a violent offense can support a manslaughter charge.

¶38 Additionally, we agree with the reasoning of the Court of Appeals. It found, under the second prong of the *Workman* test, that Olsen was not entitled to a second degree manslaughter instruction because his defense was not that the victim was still alive when he began participation in the robbery, as it would need to be to support the proposed instruction, but rather his defense amounted to a denial that he participated in the murder at all. Even if we accept Olsen's legal theory, the evidence did not support any causal relationship between Olsen and the death due to Olsen's alleged negligence in failing to summon aid. There is no evidence that Totten was still alive when Olsen

(3) The duty to notify a person or agency under this section is met if a person notifies or attempts to provide such notice by telephone or any other means as soon as reasonably possible.

(4) Failure to report as required by subsection (1) of this section is a gross misdemeanor. However, a person is not required to report under this section where that person has a reasonable belief that making such a report would place that person or another family or household member in danger of immediate physical harm.

[20] We are unaware of any defendants being charged with kidnapping in this case.

arrived at the scene if, as according to Olsen, Olsen arrived after the violent acts occurred. Totten died within three to five minutes by manual strangulation, which Olsen claims he did not witness, so the reporting statute was not triggered. Olsen's testimony does not, therefore, support the inference that only the lesser included offense was committed, as is required for the instruction to be applicable.

¶39 Next, Olsen makes an extended argument, including a *Gunwall*[21] analysis, that the right to a jury trial includes the right to be instructed on applicable lesser included offenses. His arguments, however, provide no relief because there was no applicable lesser included offense instruction available to him.[22]

6. *Whether Olsen received effective assistance of counsel given his counsel's failure to submit lesser included offense instructions*

¶40 Because Olsen was not entitled to lesser included offense instructions, his claim that his counsel was ineffective for offering none necessarily fails.

7. *Whether second degree robbery in California is comparable to Washington's second degree robbery for persistent offender purposes*

¶41 At sentencing, the trial court found Sublett's prior California convictions for second degree robbery comparable to Washington convictions for second degree robbery and sentenced Sublett to life without parole as a third strike offender under the POAA. RCW 9.94A.570 (mandating life sentence for persistent offenders); RCW 9.94A.030(37) (de-

---

[21] In *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), we explained six nonexclusive factors that are examined to determine if the state constitution provides greater protection than the federal one.

[22] Olsen additionally argues the refusal to give lesser included offense instructions violated his Fourteenth Amendment due process rights. The only authoritative case Olsen cites is a capital case, where the evidence supported the lesser offense. *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). Such is not the case here.

fining "persistent offender"). The Court of Appeals affirmed, finding the elements of both crimes substantially similar, with each crime requiring a specific intent to steal.

¶42 Comparability of a prior out-of-state conviction is reviewed de novo. To determine whether a foreign offense is comparable to a Washington offense, we first consider if the elements of the foreign offense are substantially similar to the Washington counterpart. If so, the inquiry ends. If not, we determine whether the offenses are factually comparable, that is, whether the conduct underlying the foreign offense would have violated the comparable Washington statute. *State v. Thiefault*, 160 Wn.2d 409, 414-15, 158 P.3d 580 (2007) (citing *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998)). In this case, however, there is no factual record of the foreign convictions so comparability is determined based only on the legal elements of the crime.

¶43 "Robbery" is defined by California Penal Code (CPC) § 211 as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Second degree robbery is all those instances that are not included as first degree. CPC § 212.5.[23] We compare this statute with our own law defining "robbery."

---

[23] In full, the CPC § 212.5 provides:

(a) Every robbery of any person who is performing his or her duties as an operator of any bus, taxicab, cable car, streetcar, trackless trolley, or other vehicle, including a vehicle operated on stationary rails or on a track or rail suspended in the air, and used for the transportation of persons for hire, every robbery of any passenger which is perpetrated on any of these vehicles, and every robbery which is perpetrated in an inhabited dwelling house, a vessel as defined in Section 21 of the Harbors and Navigation Code which is inhabited and designed for habitation, an inhabited floating home as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, a trailer coach as

¶44 In Washington, under RCW 9A.56.190,

[a] person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

And, "[a] person is guilty of robbery in the second degree if he commits robbery." RCW 9A.56.210. Under our law, the crime of robbery includes a specific intent to steal as an essential, nonstatutory element. *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005). This is also true under California law: " 'Robbery is the taking of personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property.' " *People v. Davis*, 46 Cal. 4th 539, 608, 208 P.3d 78, 94 Cal. Rptr. 3d 322 (2009) (internal quotation marks omitted) (quoting *People v. Lewis*, 43 Cal. 4th 415, 464, 181 P.3d 947, 75 Cal. Rptr. 588 (2008)). Thus, in either state, robbery requires (1) taking (2) personal property (3) from another person or from another's immediate presence (4) against his or her will (5) by force or threatened force (6) with the specific intent to steal. The two crimes are substantially similar.

¶45 Sublett argues that because Washington law recognizes defenses to robbery that California does not, the two

defined in the Vehicle Code which is inhabited, or the inhabited portion of any other building is robbery of the first degree.

(b) Every robbery of any person while using an automated teller machine or immediately after the person has used an automated teller machine and is in the vicinity of the automated teller machine is robbery of the first degree.

(c) All kinds of robbery other than those listed in subdivisions (a) and (b) are of the second degree.

are not substantially similar.[24] In support, he relies on *Lavery*, where we compared federal bank robbery, a general intent crime, to second degree robbery under Washington law, a specific intent crime. In *Lavery*, however, the distinction regarding the element of intent alone was enough to conclude the two crimes were not legally comparable. *Lavery*, 154 Wn.2d at 256 ("Because the elements of federal bank robbery and robbery under Washington's criminal statutes are not substantially similar, we conclude that federal bank robbery and second degree robbery in Washington are not legally comparable."). Here, however, both crimes require the specific intent to steal, so *Lavery* in fact supports a finding of comparability. While available defenses were mentioned in *Lavery*, they were not discussed as having any impact on the legal comparability analysis. The focus of the comparability inquiry remains on the elements of the crimes and not the defenses. Without further support, Sublett's argument regarding defenses distinguishing the two crimes fails. Therefore, the trial court correctly found comparability.

## CONCLUSION

¶46 We affirm the Court of Appeals and find no error by the trial court in the denial of severance, in not answering an inquiry from the jury, in the accomplice liability instruction, and in not giving or offering lesser included offense instructions. We find second degree robbery in California comparable to second degree robbery in Washington, affirming the Court of Appeals. Finally, we affirm the Court of Appeals' holding that petitioners' public trial rights were not violated, but on different grounds. We find that neither experience nor logic supports the conclusion that the discussion regarding the appropriate response to a jury ques-

---

[24] Washington recognizes a diminished capacity defense to robbery, whereas California does not. *See State v. Thamert*, 45 Wn. App. 143, 146, 723 P.2d 1204 (1986) (whenever intent is element of crime, diminished capacity available as defense); CPC § 25 (abolishing defense of diminished capacity).

tion, where no objection or dispute to the response is shown, need occur in open court, so long as the jury's question and response are placed in the record.

CHAMBERS, OWENS, and J.M. JOHNSON, JJ., concur.

¶47 MADSEN, C.J. (concurring) — I agree with the court's decision and concur in the result reached by the court.

¶48 The present case is one of several cases that have come before the court involving the right to a public trial: *State v. Sublett*, 176 Wn.2d 58, 292 P.3d 715 (2012) (plurality opinion); *State v. Paumier*, 176 Wn.2d 29, 288 P.3d 1126 (2012); *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012); and *In re Personal Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012) (plurality opinion). I have written opinions in each of the latter three cases but take the opportunity here to write a single opinion touching on the multiple aspects of the public trial right and appellate review as they are presented by all four cases. My intent is to present as complete a picture of the court's decisions in this area as these cases suggest. In this way, I explain why I believe the court's approach to reviewing public trial issues is exceptionally and unnecessarily strict, better than I could do by only writing separate opinions addressing the individual issues in each case.

¶49 It is without doubt a critical function of the court to carry out the constitutional requirement that criminal justice be rendered in public, to ensure that judges, prosecutors, and witnesses are ever mindful to carry out their respective responsibilities so that a fair and impartial proceeding results, and to encourage witnesses to come forward and testify truthfully. But recently this court has ordered a new trial in virtually every case where a closure occurred without an on-the-record inquiry into whether closure was justified, regardless of whether the claimed

error was preserved and regardless of whether the particular error could possibly have had any effect on the defendant's receipt of a fair trial. When doing so, the court has dispensed with its own Rules of Appellate Procedure.

¶50 We often address deeply valued and closely held constitutional rights that must be protected to assure that a criminal defendant has a fair and just trial. However, there are procedural requirements that generally must be satisfied for appellate review of claimed constitutional errors, even with respect to the most fundamental rights we are privileged to enjoy, such as the right to remain silent, the right to confront witnesses, the right to compel attendance of witnesses, and the right to present a defense. For example, we generally insist that an objection is required to preserve claimed error, and if there is no objection then we apply a more stringent standard for review of a claimed violation of a constitutional right. The defendant must show that the asserted constitutional violation is manifest and had a negative impact on the outcome of the proceedings. But a majority of the court has decided that no such showing is ever required for a violation of the public trial right, notwithstanding the failure to object.

¶51 Additionally, when a violation of even an important constitutional right is claimed, we will consider the record to determine whether the violation actually occurred. But in the context of the right to a public trial, if the trial court did not engage in an on-the-record inquiry into whether closure was justified, this court now assumes that the closure was not justified and declines to permit any further inquiry, even if the record would conclusively show that the closure was justified. Indeed, in one of the cases presently before the court, the majority significantly undermines the precedential force of a prior case where we did examine a record that showed effective but not express compliance

with the required on-the-record inquiry.[25] Instead, in *Wise*, *Paumier*, and *Morris*, the majorities[26] reiterate the rule that the record will not be examined to determine if it shows that the closure was in fact justified.

¶52 In addition, the court declines to permit remands for entry of facts on the issue whether closure was justified or remand for a hearing on the issue. Thus, it is entirely possible that even a minimal closure, which an after-the-fact inquiry might show was fully justified, will require a new trial because no on-the-record inquiry was made at the time of the closure.

¶53 The court has effectively created a new constitutional right virtually independent of the public trial itself— the right to an on-the-record inquiry.

¶54 When compared to the decisions of the United States Supreme Court and many other federal and state courts, our state's law is remarkable for its severe and categorical approach. For example, in cases when no suitable inquiry occurred at the time of the closure, other courts often examine the record, remand for fact-finding, or remand for a hearing on the issue whether the closure was justified.

¶55 I begin by examining the concerns involved in determining whether the public trial right is implicated at all, the issue in *Sublett*. I then turn to the question whether, if the public trial right is implicated, there is in fact a closure of the courtroom; and if there is a closure, whether it implicates the public trial right. If a closure occurs that does implicate the public trial right, the next issue is whether the closure was justified because a justified closure does not violate the defendant's right to a public trial. This issue raises the question whether only a contemporaneous on-the-record inquiry into justification will be con-

---

[25] *Wise*, 176 Wn.2d at 12-13 (virtually distinguishing *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009) out of existence on the issue whether the existing record can be examined).

[26] The majority in *Morris* is comprised of the lead opinion and the concurrence by Justice Chambers.

sidered on appellate review, foreclosing review of the claimed error where an inquiry was not performed prior to closing the courtroom.

¶56 I next address the matter of reviewing claimed violations of the public trial right, including the issue whether an objection is required and what approach is appropriate if no objection to closure was made; whether a violation must invariably be considered structural error so that no showing of prejudice is required; and whether a violation must lead to reversal and a new trial or other proceeding. These issues arise in *Wise*, *Paumier*, and *Morris*.

¶57 I will explain how I believe the four cases before the court should be resolved. My intent is to show that in many respects this court has taken an unwarranted, hard-line approach to the matter of public trial violations, with the result that we reverse and require new trials where there is no constitutional need to do so.

¶58 We can honor the constitutional right, give it full force and effect, ensure that it serves its purposes, and protect the defendant's rights without taking the restrictive position that the majorities' decisions in *Wise*, *Paumier*, and *Morris* represent.

## Whether a Closure Occurred

¶59 The first issue that often arises is whether the case in fact involves a closure implicating the constitutional right to a public trial. There are cases that involve a particular trial aspect or procedure and the question is whether this particular part of a trial is ever within the protection of the public trial right. *Sublett* is this type of case, and a majority of the court employs the "experience and logic" test for the purpose of determining whether the public trial right is implicated at all with respect to the particular procedure.

## Experience and Logic Test

¶60  In *Sublett,* the court provides guidance for determining whether the right to a public trial attaches to a particular aspect of a criminal trial. The analysis will prove useful, especially given that in recent years we have seen a significant number of appellate cases in this state involving the public trial right.

¶61  The "experience and logic" test that the court uses in *Sublett* is found in First Amendment cases involving the right of the public and the press to access court proceedings. To this point, I have not discovered any case where this test has been used to decide whether the Sixth Amendment right to a public trial applies, although there are a number of cases where the experience and logic test has been applied to determine that a particular criminal proceeding should be open to the public and the press under the First Amendment. *E.g., United States v. Alcantara,* 396 F.3d 189, 198 (2d Cir. 2005) (plea colloquy and sentencing proceedings; interestingly, the court found the First Amendment right existed in response to the *defendants'* arguments, unlike the typical case where a member of the media argues applicability of the First Amendment right); *United States v. Wecht,* 537 F.3d 222, 235-39 (3d Cir. 2008) (presumptive right of access under the First Amendment includes jurors' names); *Applications of Nat'l Broad. Co.,* 828 F.2d 340 (6th Cir. 1987) (First Amendment right of access to preliminary proceedings concerning whether a judge must be disqualified for bias and to inquire into an attorney's possible conflict of interest); *Oregonian Publ'g Co. v. U.S. Dist. Court,* 920 F.2d 1462, 1465-66 (9th Cir. 1990) (First Amendment right of access to plea agreements). After applying the experience and logic test, courts have also concluded that the First Amendment right of access does not apply to a particular type of criminal proceedings. *E.g., Times Mirror Co. v. United States,* 873 F.2d 1210, 1213-18 (9th Cir. 1989) (no First Amendment right of access to issuance of pre-indictment search warrants).

¶62 There is a recognized close relationship between the First Amendment right of the public and press to access criminal proceedings and the defendant's Sixth Amendment right to a public trial. The United States Supreme Court in *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984), relied on First Amendment cases when it determined the Sixth Amendment right to a public trial applies to a pretrial suppression hearing. The Court recently reminded us, though, that "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive is an open question." *Presley v. Georgia*, 558 U.S. 209, 213, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010). One cannot assume the same analysis will always apply to the two rights.

Disagreement about the Scope of the Right to a Public Trial

¶63 Despite its use in the First Amendment context, as mentioned other courts have not addressed whether the experience and logic test is an appropriate test to determine whether the Sixth Amendment right of the defendant applies. Rather, courts have approached the problem in other ways.

¶64 Some courts have declared that the right to a public trial applies to the entire trial. *E.g., United States v. Sorrentino*, 175 F.2d 721, 722 (3d Cir. 1949); *Barrows v. United States*, 15 A.3d 673, 679 (D.C. 2011); *Sirratt v. State*, 240 Ark. 47, 54-55, 398 S.W.2d 63 (1966); *State v. Tapson*, 2001 MT 292, 307 Mont. 428, 435, 41 P.3d 305; *State v. Lawrence*, 167 N.W.2d 912, 915 (Iowa 1969); *State v. Pullen*, 266 A.2d 222, 228 (Me. 1970), *overruled on other grounds by State v. Brewer*, 505 A.2d 774 (Me. 1985); *Commonwealth v. Patry*, 48 Mass. App. Ct. 470, 474, 722 N.E.2d 979 (2000).

¶65 Other courts have disagreed. In *United States v. Ivester*, 316 F.3d 955, 958-59 (9th Cir. 2003), the court explained:

Though some courts and treatises boldly declare that the Sixth Amendment right to a public trial applies to the entire trial,

*United States v. Sorrentino,* 175 F.2d 721, 722 (3d Cir. 1949); WAYNE R. LAFAVE, HEROLD H. ISRAEL, NANCY J. KING, 5 CRIM[INAL] PROC[EDURE] § 24.1(a) (2d ed.1999) (the Sixth Amendment right to a public trial "covers the entire trial, including the impaneling of the jury and the return of the verdict"), this position has been rejected by recent decisions which demonstrate that the right to a public trial does not extend to every moment of trial. *See, e.g., United States v. Edwards,* 303 F.3d 606, 616 (5th Cir.2002) ("We must first determine whether *Waller* applies to" the court's decision to empanel an anonymous jury).

Thus, we must determine whether the proceedings in question implicate the Sixth Amendment.

(Some citations omitted.)

¶66 The *Ivester* court concluded that the right to a public trial was not implicated with respect to a discussion between the court and counsel about how to handle questioning of the jurors about possible fears for their safety. *Id.* at 959. Rather, the court determined that this discussion "was technical and administrative" and did not impact the Sixth Amendment right to a public trial. *Id.* The court in *Ivester* considered a second situation that occurred in the case, the judge's questioning of a juror in chambers with the parties and counsel present. The court observed that other courts had held that a judge's questioning of a juror in chambers without spectators or the defendant did not violate the constitutional rights of the defendant and it therefore followed that the Sixth Amendment public trial right was not violated when such questioning occurred with the parties and counsel present. *Id.*

¶67 Other decisions include *United States v. Olano,* 62 F.3d 1180, 1190-91 (9th Cir. 1995), where the court held that the district court judge's meeting with one juror in chambers about her impartiality given her daughter's new job did not deprive the defendant of his right to a public trial; *United States v. Norris,* 780 F.2d 1207, 1210 (5th Cir. 1986), where the court held that the right to a public trial does not extend to bench conferences during trial "between counsel

and the court on . . . technical legal issues and routine administrative problems" where "no fact finding function is implicated"; *United States v. Vazquez-Botet*, 532 F.3d 37, 51-52 (1st Cir. 2008), where the court concluded that the public trial right does not apply to a " 'question-and-answer' offer of proof, the purpose of which was to create a record so [the appellate court] could determine the propriety of the [trial] court's relevancy ruling" (footnote omitted); *United States v. Brown*, 669 F.3d 10 (1st Cir.), *cert. denied*, 132 S. Ct. 2448 (2012), where the First Circuit concluded that none of the considerations underlying the right to a public trial were implicated and the Sixth Amendment public trial right did not extend to in-chambers questioning of a juror about remarks of a witness following his testimony, where the sole purpose was in connection with possible treatment of a contemptuous witness; and *People v. Olivero*, 289 A.D.2d 1082, 1082, 735 N.Y.S.2d 327 (2001), where the court held that the public trial right did not apply to the trial court's treatment of the courtroom as an annex to its chambers for the equivalent of an in-chambers conference regarding the scope of a codefendant's immunity. *Cf. People v. Virgil*, 51 Cal. 4th 1210, 1237-38, 253 P.3d 553, 126 Cal. Rptr. 3d 465 (2011) (not every sidebar conference rises to the level of a constitutional violation; brief bench conferences during jury selection about sensitive subjects when the courtroom itself was open to the public and the defendant was present did not deprive the defendant of his right to a public trial), *cert. denied*, 132 S. Ct. 1636 (2012).

¶68 Similarly, the federal District Court for the Western District of Washington determined that the defendant's right to a public trial was not violated when the court conducted an in-chambers conference with his trial counsel. *Anh Vu Nguyen v. Wingler*, 2010 WL 691411, at *8, 2010 U.S. Dist. LEXIS 17037, at *21-22 (Jan. 5, 2010) (unpublished). The court commented that the United States Supreme Court has never held the right to a public trial extends to in-chambers conferences and other courts have

recognized that the right does not extend so far. *Anh Vu Nguyen,* 2010 WL 691411, at *8, 2010 U.S. Dist. LEXIS 17037, at *21; *see Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 598 n.23, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (Brennan, J., concurring) ("when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle" and the court's opinion does not "intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings").

¶69 The Court of Appeals has applied a similar standard, as the lead opinion recognizes in the present case, lead opinion at 71-72, when it discusses cases where the Court of Appeals has determined that no violation of the public trial right occurs in connection with purely ministerial or legal issues that do not require disputed facts to be resolved. *See State v. Castro,* 159 Wn. App. 340, 246 P.3d 228 (2011) (pretrial hearing addressing whether to exclude witnesses and whether the State could impeach the defendant with prior criminal history); *State v. Koss,* 158 Wn. App. 8, 241 P.3d 415 (2010) (in-chambers discussion of language injury instructions, followed by on-the-record open court proceeding for opportunity to object), *petition for review filed,* No. 85306-1 (Wash. Nov. 16, 2010); *State v. Sadler,* 147 Wn. App. 97, 114, 193 P.3d 1108 (2008) (stating principle); *State v. Rivera,* 108 Wn. App. 645, 32 P.3d 292 (2001) (public trial right not implicated when trial court addressed a juror's complaint about another juror's hygiene).

### *Sublett*

¶70 I agree with the decision in *Sublett* that not every aspect of criminal proceedings is subject to the right to a public trial. Under the experience and logic test, history is one source of guidance as to whether a particular part of the proceedings is one to which the right to a public trial attaches. If precedent or other history, or both, are silent, then the second part of the analysis involves inquiry into

whether the particular procedure, hearing, discussion, decision, or other aspect of the case is one to which the public trial right should apply. This demands an examination of the values served by the right to a public trial and whether they would be furthered if the right is applied with respect to the part of the proceedings in question. If these values would not be served by concluding that a particular aspect of a trial should be public, when this issue is one for which history provides no answer, then there is no constitutionally imperative reason for attaching the public trial right to the particular part of the proceedings. The ministerial/legal inquiry applied by the Washington State Court of Appeals and other courts also involves an inquiry into whether the values served by the public trial right would be served by holding that the right applies to the particular proceeding or procedure at issue.

¶71 These values are ensuring that the defendant has a fair trial, to remind the trial judge and prosecution of the importance of their functions and the obligation to the accused to carry out their responsibilities, and to encourage witnesses to come forward and testify truthfully. *Waller*, 467 U.S. at 46-47. Because protecting and advancing these values are the core concerns of the right to a public trial, when they are not implicated it is unnecessary to require public proceedings in open court. These values are not quantifiable, but that does not mean they cannot be ascertained. Both the experience and logic test and the ministerial/legal analysis are useful tools that further the resolution of whether the public trial right attaches at all and both involve the crucial inquiry into the values underscoring the right.

¶72 I agree with the court's decision in *Sublett* that the right to a public trial is not implicated when, in chambers and

with counsel present, the trial judge considers a question submitted by the jury during the course of its deliberations.[27]

## Justified Closures

¶73 The next issue, if the right to a public trial is at stake, is whether there has been a violation of the right. In *Waller*, the United States Supreme Court explained that the public trial guaranty creates a presumption of openness that is not absolute and abridgement of the Sixth Amendment right to a public trial may be justified when a courtroom closure would advance an overriding compelling interest that is likely to be prejudiced if no closure occurs;[28] the closure is no broader than necessary to protect that

---

[27] The court in *State v. Swanson*, 112 Haw. 343, 354, 145 P.3d 886 (2006) similarly concluded that responses to jury communications are the functional equivalent of an instruction and the defendant's right to a public trial was not implicated when the jury sent the court a number of communications after business hours when the court was closed and locked (normal security caused the building to be closed).

[28] Many courts have held that when less than a total closure is at issue, a less stringent "substantial reason" test applies to determine whether a partial or narrow closure is justified. *Bucci v. United States*, 662 F.3d 18, 23 (1st Cir. 2011), *cert. denied*, 133 S. Ct. 277 (2012); *United States v. DeLuca*, 137 F.3d 24, 32-35 (1st Cir. 1998); *United States v. Smith*, 426 F.3d 567, 571-74 (2d Cir. 2005); *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992); *United States v. Osborne*, 68 F.3d 94, 98-99 (5th Cir. 1995); *Garcia v. Bertsch*, 470 F.3d 748, 752-53 (8th Cir. 2006); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989); *United States v. Brazel*, 102 F.3d 1120, 1155-56 (11th Cir. 1997); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984); *United States v. Flanders*, 845 F. Supp. 2d 1298 (S.D. Fla. 2012); *Angiano v. Scribner*, 2008 WL 4375619, at *11-12, 2008 U.S. Dist. LEXIS 123196, at *26-31 (C.D. Cal. 2008); *United States v. Weed*, 184 F. Supp. 2d 1166, 1176 (N.D. Okla. 2002); *Commonwealth v. Martin*, 39 Mass. App. Ct. 44, 49, 653 N.E.2d 603 (1995); *State v. Turrietta*, 2011-NMCA-080, 150 N.M. 195, 197, 258 P.3d 474; *State v. Drummond*, 2006-Ohio-5084, 111 Ohio St. 3d 14, 22, 854 N.E.2d 1038; *State v. Sams*, 802 S.W.2d 635, 640 (Tenn. Crim. App. 1990). A "less stringent standard [is] justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." *Woods*, 977 F.2d at 76.

The Second Circuit has explained that in determining whether a closure is a narrow, "partial closure," a number of factors may be considered, including the closure's duration, whether the public can learn what occurred, for example, through a transcript of the proceedings, and whether all of the public was excluded or only selected members. *Carson v. Fischer*, 421 F.3d 83, 87-90 (2d Cir. 2005); *Bowden v. Keane*, 237 F.3d 125, 129-30 (2d Cir. 2001).

overriding interest; the trial court considers reasonable alternatives to closure; and the court makes adequate findings to support the closure. *Waller*, 467 U.S. at 48. Recently, as indicated, the Court explained that the trial court must on its own initiative consider reasonable alternatives to closure. *Presley*, 558 U.S. at 211-14.

¶74 Our court has followed a nearly identical test, first described in *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).[29] The proponent of closure must show a compelling interest that justifies closure and if this interest is a right other than one held by the accused, the proponent must show that the right is seriously and imminently threatened. Any person present when a closure motion is made must be provided the opportunity to object to closure. The method of closing the courtroom must be the least restrictive available that will still protect the threatened interest. (In accord with *Presley*, the consideration of reasonable alternatives must be made even if no party raises the issue.)[30] The court has to weigh the competing interests of the proponent and the public. And finally, the closure

---

[29] We have consistently followed the Court's precedent under the Sixth Amendment when considering closures under both the Sixth Amendment and article I, section 22 of the Washington State Constitution.

[30] *Presley* does not dictate the result in the cases before the court, despite some of the arguments advanced in the briefing. In *Presley*, the defendant objected to the closure, which is not true in any of the cases before our court. Proper review of the claimed errors is not controlled by *Presley* and we can apply our rules of appellate procedure that normally govern review of claimed constitutional errors. Also, as explained above, *Presley* does not address the issue of whether a closure occurred in the first place. Accordingly, the court is free, for example, to consider whether the asserted closures were de minimis and so did not implicate the constitutional question, as many courts have done after the decision in *Presley*. The Court in *Presley* also declined to decide the defendant's claim that the trial court failed to identify any overriding interest that was likely to be prejudiced unless the proceeding was closed, although the Court did say that even if this was true the trial court must still consider any reasonable alternatives to closure.

The Court in *Presley* remanded the case for further proceedings not inconsistent with its opinion. *Presley*, 558 U.S. at 216. Because the Court did not order a new trial, *Presley* does not demand that a new trial occur if our court decides that a closure violated the right to a public trial. Whatever may be the appropriate remedy, aside from the necessity of further proceedings, it is not determined under *Presley*.

order must be no broader than necessary. *Bone-Club*, 128 Wn.2d at 258-59.

¶75 Thus, not all courtroom closures violate the right to a public trial.

<u>In the Absence of an On-the-Record *Bone-Club* Inquiry, Posttrial *Bone-Club* Analysis May Be Appropriate</u>

¶76 In *Wise, Paumier,* and *Morris,* a major issue is whether the failure to conduct an on-the-record *Bone-Club* inquiry mandates reversal and a new trial. The majorities in *Wise* and *Paumier* have taken the unfortunate position that if a trial court fails to make this inquiry at the time of closure, it cannot be done later. The court decides in *Morris* that "failing to consider *Bone-Club* before privately questioning potential jurors violates a defendant's right to a public trial and warrants a new trial on direct review." *Morris,* 176 Wn.2d at 166; *see also Wise,* 176 Wn.2d at 19 (the defendant's "public trial right was violated by the closure of part of voir dire proceedings without the requisite consideration of *Bone-Club*"); *State v. Brightman,* 155 Wn.2d 506, 515-16, 122 P.3d 150 (2005) ("in order to support full courtroom closure during jury selection, a trial court must engage in the *Bone-Club* analysis; failure to do so results in a violation of the defendant's public trial rights").

¶77 But a more accurate description of the *Bone-Club* requirement is that it is mandated " 'to protect a defendant's right to [a] public trial.' " *In re Pers. Restraint of Orange,* 152 Wn.2d 795, 809, 100 P.3d 291 (2004) (alteration in original) (quoting *Bone-Club,* 128 Wn.2d at 259). The *Bone-Club* inquiry is not, in and of itself, the constitutional right. In other words, when the *Bone-Club* inquiry is not made on the record, this does not tell us whether the closure *in fact* violated the defendant's public trial right, which we know is not absolute since closing a court may be justified and therefore the closure will not violate the public trial right. Indeed, an after-the-fact *Bone-Club* inquiry could well show that the closure was justified and that there were

no reasonable alternatives to the closure. Because of this possibility, the failure to engage in the inquiry should not turn a justifiable closure into a violation of the right to a public trial.

¶78 When a posttrial *Bone-Club* inquiry can be made and would show that a closure was justified, requiring new trials has no positive purpose but instead leads to delayed justice and additional costs, not all of which are quantifiable but which are nevertheless onerous. These can include the time and effort of the courts, the prosecuting agencies, and the defense attorneys, often public defenders, who must retry the cases; the burdens, including possible distress and anxiety, placed on another jury; the burdens placed on victims and other witnesses who must go through the process of another trial; the losses in relevant evidence that come with long-delayed presentation, when witnesses' memories are not as clear as at the time of the original trial; and the dollar costs of the new trials. These are not simply possible concerns for future cases but are concrete concerns in *Wise, Paumier*, and *Morris* because these cases are remanded for unnecessary new trials without a showing that the constitutional right was violated in fact.[31]

¶79 In these three cases, the issue is whether individually questioning jurors on sensitive topics in a nonpublic setting violates the right to a public trial. In *Wise*, 10 prospective jurors were privately questioned in the judge's chambers, with the trial judge, the prosecution, and defense counsel present. The questioning was recorded and transcribed. There were no objections to the procedure. In *Paumier*, the judge, the prosecution, defense counsel, and the defendant were all present for the questioning, and there were no objections. The in-chambers questioning was recorded and transcribed. In *Morris*, 14 potential jurors were questioned in chambers and 6 were excused for cause. The trial judge and counsel were present, with the defen-

---

[31] It is also likely that the decision in *Morris* will lead to a number of personal restraint petitions raising the same issue.

dant having waived the right to be present while the questioning in chambers occurred. Defense counsel explained that he had discussed with the defendant the fact it would be more likely for jurors to be forthcoming if he was not present. There was no objection to the procedure. The questioning was recorded and transcribed.

¶80 In each case a majority of the court concludes that the closure without the *Bone-Club* inquiry is a violation of the right to a public trial. The court refuses to engage in or otherwise permit any posttrial inquiry *into* whether the closure was justified. *See Wise*, 176 Wn.2d at 12-15 ("[w]e do not comb through the record"; the trial court's failure to engage in the *Bone-Club* inquiry is error and the wrongful deprivation of the right to a public trial is structural error requiring a new trial); *Paumier*, 176 Wn.2d at 34-35 (same; "we are left with no other choice but to order a new trial"); *Morris*, 176 Wn.2d at 166 (observing that on direct review "failing to consider *Bone-Club* before privately questioning potential jurors violates a defendant's right to a public trial and warrants a new trial"); *id.* at 165-68 (holding the same result ensues on collateral review when the issue arises through a claim of ineffective assistance of counsel); *id.* at 173 (Chambers, J., concurring). The majorities in these cases do not permit an after-the-fact assessment of the closure to determine whether it was justified under *Bone-Club* and *Waller*. *See also Brightman*, 155 Wn.2d at 518; *Orange*, 152 Wn.2d at 810; *Bone-Club*, 128 Wn.2d at 261 (the determination of whether a compelling interest justifies closure is the affirmative duty of the trial court, not the appellate court).

¶81 But in *Waller*, after holding that any closure over the defendant's objections must meet the tests applied in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984), and its predecessors, the Court *itself* "[a]ppl[ied]" these tests to the cases at bar" and concluded that the closure of the entire suppression hearing was not justified. *Waller*, 467 U.S. at 47-48. The Court did not suggest

in any way that reversal is automatically required if the trial court did not make the inquiry prior to the closure.

¶82 The majorities' refusals to permit an after-the-fact inquiry into the justifications for closure or to engage in these inquiries in *Wise, Paumier*, and *Morris* serve no useful purpose. In these cases, the individual questioning of a limited number of potential jurors occurred in the presence of the judge, counsel, and the defendant (in one case, the defendant affirmatively waived the right to be present), and was recorded and transcribed. When this court refuses to examine such a record—the recorded, public transcript of the proceedings, including the individual voir dire that occurred—to determine whether the closure would have been justifiable under an on-the-record *Bone-Club* inquiry had one taken place, it exalts the form of the public trial right above its substance. The values served by the right to a public trial are not quantifiable, but real; however, it is difficult to agree that any real harm to the defendants' rights to public trials occurred in the circumstances of these cases. The courts' decisions also render the work of the juries in these cases a nullity.

¶83 It is a mystery why, if the trial court does not engage in an on-the-record *Bone-Club* inquiry prior to closure, this court believes it must foreclose all other possible ways in which the inquiry could be conducted. Many appellate courts conduct a review of the record to determine if the record shows that closure was warranted. Numerous appellate courts have remanded cases to the trial courts to make factual findings or hold hearings for the purpose of making the inquiry required under *Waller*, especially where the record is inadequate for review. On collateral review involving the public trial right, many courts have remanded the case for a reference hearing on whether closure was justified.

¶84 In *Kendrick v. State*, 670 N.E.2d 369 (Ind. Ct. App. 1996), before addressing the issues on appeal the Indiana

Court of Appeals initially remanded the case to the trial court to enter findings regarding its order closing the courtroom during the testimony of a confidential informant and, after receiving the findings, the appellate court then addressed the issues whether the trial court erred in closing the courtroom and whether the defendant was denied effective assistance of counsel because of counsel's failure to object to the closure. In *People v. Kline*, 197 Mich. App. 165, 494 N.W.2d 756 (1992), the court found the trial court had failed to make findings on the record to support the closure during the testimony of a young rape victim. The court recognized that the government may have a sufficient interest in protecting young witnesses in cases of alleged sexual abuse. *Id.* at 171. The court concluded that the failure to state findings on the record, in and of itself, did not require a new trial and remanded to the trial court with directions to supplement the record with the facts and reasoning on which the partial closure was based. *Id.* at 172. In *United States v. Galloway*, 937 F.2d 542, 547 (10th Cir. 1991), *vacated on other grounds*, 56 F.3d 1239 (10th Cir. 1995), the court held that the appropriate remedy for the trial court's failure to make findings supporting partial closure is remand to the trial court to specify the facts and reasoning on which the closure was based.

¶85 In *Nieblas v. Smith*, 204 F.3d 29, 32 (2d Cir. 1999), the Second Circuit Court of Appeals concluded on collateral review that it is "particularly appropriate for a habeas court to gather additional evidence—rather than granting the defendant the 'windfall' of a new trial—where the alleged constitutional violation does not affect the fairness of the outcome at trial, as in courtroom closure cases like" the one at hand. *See also, e.g., Smith v. Hollins*, 448 F.3d 533, 541 (2d Cir. 2006); *Hoi Man Yung v. Walker*, 341 F.3d 104, 112 (2d Cir. 2003); *Bowden v. Keane*, 237 F.3d 125, 132 (2d Cir. 2001) (based on evidence gleaned from the record, the trial court did not abuse its discretion in closing the courtroom during the testimony of an undercover officer); *Brown v.*

*Kuhlmann*, 142 F.3d 529, 537-38 (2d Cir. 1998); *Woods v. Kuhlmann*, 977 F.2d 74, 77-78 (2d Cir. 1992) (information from various parts of the record sufficiently justified partial, temporary closure); *Bell v. Jarvis*, 236 F.3d 149, 172 (4th Cir. 2000); *United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995); *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994) (court found sufficient support in the record for partial temporary closure); *Tinsley v. United States*, 868 A.2d 867, 880 n.19 (D.C. 2005); *McIntosh v. United States*, 933 A.2d 370, 379 (D.C. 2007) (the "court need not ignore record facts that indicate the courtroom closure may have been justified by compelling reasons"); *State v. Biebinger*, 585 N.W.2d 384, 385 (Minn. 1998) (appropriate initial remedy is remand for an evidentiary hearing on whether closure is justified, not retrial); *State v. Infante*, 796 N.W.2d 349, 355 (Minn. Ct. App. 2011); *State v. Weber*, 137 N.H. 193, 196-97, 624 A.2d 967 (1993) (where a state statute improperly placed the burden on the defendant to show that closure was not required during the testimony of young victims of alleged sexual assault, and so violated the right to a public trial, the court remanded for a determination whether closure was justified under *Waller* test).

¶86 Unfortunately, when a posttrial inquiry is foreclosed, the result is that the defendant has a free pass to a second trial, all at enormous and unnecessary cost to the State of Washington, the justice system, the juries, the parties, the victims, and the witnesses.

¶87 Finally, an after-the-fact assessment of justification would not impair the constitutional right. As the majority points out in *Wise*, when the trial court in the first instance engages in the *Bone-Club* analysis and determines that closure is warranted, appellate review is conducted under the abuse of discretion standard. *Wise*, 176 Wn.2d at 11. Because even this highly deferential standard sufficiently protects the constitutional right at stake, it follows that a standard and scope of review permitting inquiry under the *Bone-Club* criteria after the fact would not be constitution-

ally deficient review. It is simply not necessary to assume that a violation of the constitutional right must be found if no contemporaneous inquiry is made.

¶88 The court's decisions that failure to conduct an on-the-record inquiry at the time of closure mandates a new trial is a harsh rule that is not required by any United States Supreme Court case, and numerous courts routinely make or call for after-the-fact assessments of whether a closure was justified and accordingly not a violation of the right to a public trial. After-the-fact determinations of whether a closure was justified should be permitted, on the record, on remand, or in a reference or other evidentiary hearing, as appropriate, by a reviewing court, the trial court, or superior court. I would conclude in *Wise*, *Paumier*, and *Morris* that a new trial is not necessary in every case where a *Bone-Club* or *Waller*-type inquiry on the record was not made prior to closure.

## Applying the *Bone-Club* Inquiry into the Closures for Limited Questioning of Potential Jurors on Sensitive Subjects

¶89 *Wise*, *Paumier*, and *Morris* and other recent cases have involved individual voir dire of jurors out of the public eye. In addition to the costs outlined above, refusing to consider whether the closures were justified in these cases does a disservice to the members of the public who come to the courts as potential jurors, engaged in their civic duties, without whom the promise of a jury of one's peers cannot be carried out. As the United States Supreme Court explained when it addressed public access to voir dire in criminal cases, very private matters often arise in the process of jury selection. Potential jurors should be able to air these histories and experiences and problems *in private*:

> The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain. . . .

To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

*Press-Enter.*, 464 U.S. at 511-12.

¶90 Potential jurors come into the court with all of their most private experiences and history, including, for example, personal histories of sexual abuse as children or of sexual assaults as an adult; histories of objectively irrational but very real phobias that may be personally humiliating and which may arise during court proceedings; histories of criminal convictions; or physical conditions that cause the individual embarrassment and which may do so during a trial. It is simply not believable that individuals who would be forthcoming about such sensitive topics aired in the relative privacy of the judge's chambers or a closed court would respond with the same forthrightness if questioned in public view or that of the rest of the jury venire.

¶91 It is therefore to the benefit of our jury system and the goal of an impartial jury to allow private questioning. It is also to the benefit of the court, which must decide whether a juror may be dismissed for reasons that make jury duty an undue burden. It is clearly for the benefit of the individual potential jurors who would much prefer to offer such sensitive information in a private setting. It is to the benefit of the defendant because it helps ensure an impartial jury and, to the extent possible, assists the defendant in making informed assessments of a potential juror's full and honest responses in aid of decisions on preemptory strikes and challenges for cause.

¶92 As many courts have held, this practice, in and of itself, does not violate a defendant's constitutional rights.

*See Olano*, 62 F.3d at 1190-91 (the district court's one-on-one meeting to determine a juror's impartiality did not violate the right of confrontation or due process); *Parker v. United States*, 404 F.2d 1193, 1197 (9th Cir. 1968) (the district court correctly individually interviewed jurors, with only the court reporter present, about what they had seen, heard, or read recently about the defendant's prior but now withdrawn guilty plea); *Polizzi v. United States*, 550 F.2d 1133, 1137 (9th Cir. 1976) (same); *see also United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (per curiam) (" '[t]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right' "; " '[the] defense has no constitutional right to be present at every interaction between a judge and a juror' " (first alteration in original) (quoting *Rushen v. Spain*, 464 U.S. 114, 125-26, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (Stevens, J., concurring in judgment))).

¶93 It is unimaginable to me that when the proceedings are recorded and transcribed, the practice of *limited* questioning of *some* potential jurors in private on sensitive subjects to ensure candid and complete responses is not justifiable under *Bone-Club*.

¶94 An after-the-fact-review of the record under *Bone-Club* shows in each case: The interests of the defendant in obtaining truthful and complete responses for purposes of making informed decisions during jury selection and in a fair and impartial jury and a fair trial, and the interests of the jurors in their privacy and avoiding embarrassing exposure, together and in total overrode the defendant's interest in having this limited portion of voir dire held in open court. These overriding interests were appropriately protected by the limited in-chambers questioning. The public's right to be informed about the court's procedures and what took place was not impeded because there is a transcript of the proceedings in each case that may be reviewed to see that no improper or suspicious activity took

place. Actual jury selection did not take place in chambers, but instead the process was continued in open court where the jury was finally selected. Accordingly, if there were any members of the public who were aware of any reasons why a particular person should not have served as a juror and who should have had the opportunity to air this belief in open court or advised the defendant of concerns, this opportunity existed. To the extent a member of the public might have commented on the questions and answers given in private at the time they were provided, this possibility does exist but alone is not significant enough to preclude closure. Moreover, the defendants had the opportunity to object but did not do so, and they either participated in the process or waived the right to be present in the belief that their absence would ensure more forthright answers from the potential jurors. The questioning was limited, with the greater portion of voir dire occurring in the open courtroom.

¶95 With respect to whether there were any alternatives to the limited in-chambers questioning, this factor necessarily assumes the existence of the overriding interest or interests that must be protected, and the issue is whether that interest can be protected short of closure. *See Presley*, 558 U.S. at 216 (assuming an overriding interest in closing voir dire, the trial court must consider all reasonable alternatives to closure). No matter how the court setting is arranged to assure the questioning is sufficiently private to encourage candid answers, by definition the proceedings will be private and the public would not have access to the procedure until the record is transcribed. But at that time, the juror is not actually in the public eye and not exposed to the embarrassment of which the Court spoke in *Press-Enterprise*.

¶96 I believe that the *Bone-Club* factors show the closures were justified.

¶97 In addition, the values served by the public trial right are not impaired by limited, private questioning of jurors on sensitive topics, and for the most part these values are not

even implicated. In each of the cases a limited number of potential jurors were questioned briefly in private on a limited range of sensitive topics prior to jury selection in open court. As to the first value underscoring the right to a public trial, the defendants' rights to a fair trial were not implicated because there is no suggestion that the procedure resulted in anything but the selection of a fair and impartial jury. Indeed, the defendants' rights to a fair trial were advanced, not impeded, through private questioning that encouraged prospective jurors to speak freely about sensitive but important matters bearing on their ability to serve impartially. The defendant's knowledge of the jurors was increased, which aided injury selection.

¶98 The fact that this questioning might have led to some jurors being dismissed for cause, or through exercise of preemptory strikes, did not implicate the right to a public trial. That a different jury might have been seated can always be claimed. But obtaining a different jury is not one of the goals of the public trial right. Moreover, a defendant does not have the right to have any particular juror sit on his or her case. *City of Tukwila v. Garrett*, 165 Wn.2d 152, 161, 196 P.3d 681 (2008); *State v. Phillips*, 65 Wash. 324, 327, 118 P. 43 (1911).

¶99 As to the second value, there is nothing about this limited portion of voir dire that lessened the mindfulness of officers of the court of the importance of their respective roles in the defendant's trial. Because of the public record contemporaneously being prepared, the judges and prosecutors were reminded of the importance of their responsibilities, knowing their performance of these responsibilities would become part of the public record. This served to ensure the officers of the court appropriately carried out their duties.

¶100 As the United States Supreme Court said in *Press-Enterprise* about limited, private questioning of potential jurors and the public right of access to the courts: "When

limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests." *Press-Enter.*, 464 U.S. at 512. The Court added that "[e]ven then a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment." *Id.* In each of these cases, the proceedings were recorded and transcribed, as noted.

¶101 Finally, as to the third and fourth values served by the right to a public trial, the private questioning occurred before the prosecution and defense presented their cases. Thus, the closures had no bearing on whether witnesses were encouraged to come forward and speak truthfully, and the third and fourth values were not implicated by the closures.

¶102 In summary, the *Bone-Club* inquiry discloses no basis in *Wise*, *Paumier*, or *Morris* for reversing the defendants' convictions and remanding for new trials. And the values served by the right to a public trial are not disserved by the individual questioning of individual potential jurors on sensitive subjects. The records in these cases show that the temporary closures for limited questioning of jurors on sensitive topics did not violate the defendants' rights to public trials because the closures were justified in each case.

¶103 However, *even if* one concludes that one or more of the records in these three cases is not adequate to conduct a *Bone-Club* inquiry, the appropriate course in *Wise* and *Paumier* would then be remand for fact-finding on the issue, and in *Morris* a reference hearing should be ordered for the purpose of conducting a *Bone-Club* inquiry.[32] If in

---

[32] The court should decline to follow the path in *Orange*, where the court ordered a reference hearing for the purpose of determining the effect of the trial

any of these cases it proves impossible to conduct a posttrial inquiry that is sufficient to satisfy constitutional concerns, then new trials would be appropriate.

### Violation of the Public Trial; Failure To Object and Structural Error

¶104 The next issues concern what is required to assure that claimed error consisting of a violation of the public trial right is preserved, and what showing must be made to obtain a remedy for a violation. Again, I will address *Wise*, *Paumier*, and *Morris*, but given the dissents in these cases that explain the majorities' failures to follow the appellate rules, my aim is more to show how the majorities' approach is far more strict than required under the United States Supreme Court's decisions and is also inconsistent with the decisions of courts in numerous other jurisdictions.

¶105 Review should proceed in accord with the Rules of Appellate Procedure. When constitutional error is claimed and no objection was made at trial, review should proceed under RAP 2.5(a)(3) for claimed manifest error affecting a constitutional right. This court went astray in *Bone-Club* when it reverted to *State v. Marsh*, 126 Wash. 142, 146-47, 217 P. 705 (1923) for a rule that no objection is required for review of a claim that the right to a public trial was violated and review proceeds the same as if an objection had been made. *Marsh* greatly preceded the Rules of Appellate Procedure, and although it accurately stated the law of its time

court's ruling on the courtroom closure that occurred during the voir dire in the defendant's trial. *Orange*, 152 Wn.2d at 803. However, in examining the trial court's order entered during the trial to measure it against the required *Bone-Club* inquiry, the court disregarded the findings in the reference hearing, saying:

> [C]onsistent with our observation in *Bone-Club* that "determination of a compelling interest [is] the affirmative duty of the trial court, not the court of appeals," 128 Wn.2d at 261, we emphasize that it was the trial court's affirmative duty, not the duty of the superior court in a reference hearing more than eight years later, to identify the compelling interest justifying the encroachment on Orange's constitutional right to a public trial. The trial court did not fulfill that duty.

*Orange*, 152 Wn.2d at 810 (second alteration in original). Findings from a reference hearing should be given weight.

regarding claimed constitutional error in general, we should adhere to our present court rules that govern appellate review of claimed constitutional error.

¶106 This means that when a defendant fails to object to a courtroom closure on the ground that the closure violates the right to a public trial, to obtain review the defendant must demonstrate that the error is truly a constitutional error and establish actual prejudice. RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). The latter requirement means the defendant must make a plausible showing that the error had practical, identifiable consequences. *O'Hara*, 167 Wn.2d at 99.

¶107 Here, these requirements have been bypassed by the majorities on the basis that a courtroom closure in the absence of an on-the-record *Bone-Club* inquiry is always structural error. The failure to object will never have any effect in a case where there has been a closure of any nature, extent, or duration, and no *Bone-Club* inquiry will ever have occurred. The claimed error will always be constitutional and it will always be manifest, and it will always be reversible error because it will always be structural. A defendant will always be able to surmount the requirements of RAP 2.5(a)(3) without ever satisfying them.

¶108 That this is a poor result cannot reasonably be doubted. As explained above, the closures in *Wise, Paumier*, and *Morris* during voir dire for brief, limited purposes were fully justified under the *Bone-Club* criteria. But under the decisions in these cases, error is deemed to be structural solely because of the failure to engage in the on-the-record *Bone-Club* inquiry. Period. This trivializes the importance of the right to a public trial and the need for fair and impartial juries, and it causes misuse of our justice system for unnecessary trials.

¶109 The majorities' reactive conclusion that structural error occurred that requires new trials is incorrect for at least two reasons. First, the absence of the *Bone-Club*

inquiry in these cases should not lead to the automatic conclusion that the error is structural error. Structural error is error that defies harmless error analysis and " 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). The majorities' conclusions that structural error occurred is founded on numerous statements by the United States Supreme Court that structural error in the form of a violation of the right to a public trial occurred in *Waller*. *E.g., Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302(1991).

¶110  However, the dissent in *Paumier* is correct that the Court has never held that every public trial violation, no matter the nature, degree, or extent, is structural error. The Court has never addressed the issue, and has never even addressed structural error in any case that involved the right to a public trial.

¶111  *Waller* itself is, in some ways, a difficult case to place in the structural/nonstructural arena. The Court determined that the record conclusively showed that the complete closure of the suppression hearing in the case was not justified, i.e., the defendants'[33] constitutional rights to a public trial had *in fact* been violated. *See Waller*, 467 U.S. at 49 (the State had maintained that privacy interests had to be protected by closing the suppression hearing, and the only relevant evidence related to possible privacy interests consisted of tape recordings of intercepted telephone conversations; the Court determined that "[a]s it turned out, of course, the closure was far more extensive than necessary [because] [t]he tapes lasted only 2 ½ hours of the 7-day [suppression] hearing"). Thus, there was in fact a violation of the right to a public trial in *Waller*.

---

[33] I address below the one defendant in *Waller* who did not object during the state trial and the effect of that failure to object.

¶112 The Court remanded to the state courts to determine what portions, if any, of a new suppression hearing could be closed. *Id.* at 50. This alone makes the case quite different—essentially the Court allowed the state court a chance to engage in an inquiry into a possible justified closure of the new suppression hearing (which, from the Court's decision, would most likely involve closure of only a part of the new suppression hearing). The Court also said that a new trial would be necessary only if a new, public hearing resulted in suppression of material evidence not suppressed at the original trial. *Id.* The Court said that "[i]f, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id.* Thus, there was no automatic reversal of the convictions in *Waller* and no mandate that a new trial is necessary, as one might expect from structural error. Rather, remedy is to be appropriate to the error. *Id.*

¶113 But the present cases are not like the situation in *Waller* involving a total closure of a significant part of the criminal proceedings (the entire suppression hearing lasting over seven days) where the record affirmatively showed that the total closure was not justified by the reason proffered by the State. Here, unless the court permits a posttrial *Bone-Club* inquiry to determine whether the limited private questioning was justified under the *Bone-Club* criteria, all that can be said is that there (a) *may have been* a public trial violation, i.e., it is possible that there was a real violation where the proceedings were unjustifiably closed and (b) there *was* actual error in failing to make the *Bone-Club* inquiry on the record, but this does not mean that the closures were not actually justified or justifiable.

¶114 Given the kind of error that occurred in these three cases, the structural error analysis does not fit. The error that actually occurred was the failure in each case to engage in the proper inquiry into whether closure was justified and this error could be remediated through an

after-the-fact *Bone-Club* inquiry in each case. Because of the possibility of a positive determination[34] that no constitutional public trial error actually occurred, the error of failing to conduct the inquiry is not an error that *"necessarily* render[s] a criminal trial fundamentally unfair," *Neder*, 527 U.S. at 9, because correcting the error by a posttrial inquiry can eliminate any question of a violation of the constitutional right to a public trial. It is also not an error that would *"necessarily* render[ ]" the trial "an unreliable vehicle for determining guilt or innocence" for the same reason. *Id.*

¶115 If it turns out that the inquiry cannot be made, for whatever reason, or that the inquiry establishes that closure was not justified, then, I believe, the cases enter the realm of constitutional error that must be further addressed.[35]

¶116 *Presley*, the most recent United States Supreme Court decision on the right to a public trial, was decided after *Fulminante* and other cases that referred to *Waller* as involving structural error. It was also decided after *Recuenco*, *Neder*, and *Fulminante*, cases discussing the structural error doctrine in detail. In *Presley*, the entire voir dire was closed.

¶117 The Court held only that the trial court erred when it failed to sua sponte consider alternatives to total closure of voir dire and did not address the issue whether the closure was justified although it was asked to. The Court commented only that there was some merit to the argument because the

---

[34] By "positive" I mean that factually the constitutional violation that is claimed did not in fact exist and this can be positively established.

[35] Even if the closure is ultimately found to be structural error, this does not mean that appellate rules cannot be applied. The United States Supreme Court has explained that the federal plain error rule of Federal Rule of Criminal Procedure 52 applies even in the context of structural error. In response to a petitioner's argument that the error of which she complained was structural and so outside rule 52(b), the Court said that *"the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." Johnson v. United States*, 520 U.S. 461, 466, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) (emphasis added).

"generic" risk of jurors overhearing prejudicial comments, without any more specificity, is inherent whenever the public is present and consequently this "broad concern[ ]" stated by the trial court would permit closing voir dire "almost as a matter of course." *Presley*, 558 U.S. at 215.

¶118 The Court remanded to the state court for further proceedings consistent with its opinion and did not discuss structural error or order a new trial as one might expect if the decisions in *Wise, Paumier*, and *Morris* were correct in describing a mandatory structural error analysis under the federal constitution. Rather, the Court remanded for additional proceedings consistent with its opinion. *Id.* at 216. The Court's remand instructions are open to the possibility that a posttrial consideration of alternatives could still be made to see whether the closure was actually justified (although, given the Court's comments, it appears there may have been no justification that would suffice given the record).

¶119 Thus, *Presley* also does not direct that error is structural where it consists of the failure to engage in a *Waller*-type or a *Bone-Club* inquiry.

¶120 The second reason why I do not agree with the determinations in *Wise, Paumier*, and *Morris* that structural error occurred that requires new trials is because this assumes that if a violation of a constitutional right in one context is structural, then that category of constitutional error will always be structural.

¶121 Our decision in *Momah* is to the contrary. There, we described previous cases as involving structural error because "[p]rejudice to the defendant in those cases was sufficiently clear and required the remedy of a new trial." *State v. Momah*, 167 Wn.2d 140, 151, 217 P.3d 321 (2009). However, in *Momah* no structural error occurred because the record showed the closure was justified. *Id.* at 156.

¶122 But in a peculiar reversal of the normal rules for adhering to precedent rather than minority opinions, the

majority in *Wise* relies on the plurality opinion in *Strode* for the premise that failure to conduct the *Bone-Club* inquiry is always structural error. *Wise,* 176 Wn.2d at 15 (citing *State v. Strode,* 167 Wn.2d 222, 231, 217 P.3d 310 (2009) (Alexander, C.J., plurality)). The majority in *Wise* ultimately ignores the holding in *Momah,* going to great lengths to try to distinguish *Momah* by describing it three times as factually unique. *Id.* at 14-15. Every public trial case is factually unique and the distinction is unconvincing.

¶123 That violation of the same constitutional right can be structural error in one instance and not in another is not a remarkable idea. The example provided in the *Paumier* dissent is illustrative and shows the improvident results that can ensue from a rule that if one violation of the right to a public trial is structural, then all are. *Paumier,* 176 Wn.2d at 48 (Wiggins, J., dissenting) (quoting *Gibbons v. Savage,* 555 F.3d 112, 119-20 (2d Cir. 2009)). In *Yarborough v. Keane,* 101 F.3d 894, 897 (2d Cir. 1996), the court also addressed this question. In the following quoted passage, the court explains how the United States Supreme Court's complete analysis in *Fulminante* and the Court's cases show that the same constitutional violation may be structural in one context and subject to harmless error analysis in another:

> We do not understand *Fulminante*'s list of examples of violations that have been held exempt from harmless error review to mean that any violation of the same constitutional right is a "structural defect," regardless whether the error is significant or trivial. Nor does the fact that the Supreme Court has applied harmless error analysis to one level of violation of a particular right necessarily mean that even the most egregious violations of that right would also require demonstrated prejudice. Unless the Supreme Court has held otherwise, errors of a quality that undermines the structural integrity and fairness of the proceeding might be deemed structural, notwithstanding that less significant violations of the same constitutional right have been subjected to harmless error analysis. To determine whether an error is properly categorized as structural, we must look not only

at the right violated, but also at the particular nature, context, and significance of the violation.

The examples cited by the Supreme Court in *Fulminante* support this understanding. *Fulminante* distinguishes between errors of sufficient magnitude or significance that they call into question the validity of the proceeding and are therefore deemed structural, and trivial violations of the same rights which are not. Thus, *Fulminante* lists the "total deprivation of the right to counsel" as a structural error, 499 U.S. at 309, 111 S.Ct. at 1265 (citing *Gideon* [*v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)]), but at the same time notes that a less significant denial of the right to counsel (at a preliminary hearing) has been held to be subject to harmless error review. 499 U.S. at 307, 111 S.Ct. at 1263 (citing *Coleman v. Alabama*, 399 U.S. 1, 10-11, 90 S.Ct. 1999, 2003-04, 26 L.Ed.2d 387 (1970)). Similarly, *Fulminante* cited *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), as an example of a presence violation subject to harmless error review. 499 U.S. at 307, 111 S.Ct. at 1263. In *Rushen*, a defendant's absence from two conversations between the trial judge and a juror was held to be harmless error. 464 U.S at 120-21, 104 S.Ct. at 456-57. That very opinion, however, makes clear that in egregious circumstances a violation of the right of presence might be exempt from harmless error review. *See Rushen*, 464 U.S. at 117 n. 2, 104 S.Ct. at 455 n. 2 (explaining that "violations of the right to be present during all critical stages of the proceedings" are, "as with most [violations of] constitutional rights, . . . subject to harmless-error analysis, *unless the deprivation, by its very nature, cannot be harmless*") (emphasis added) (internal citations omitted). We therefore do not read *Rushen* as supporting the proposition that unjustified exclusion of the defendant from the entire trial would be subject to harmless error review.

*Yarborough*, 101 F.3d at 897-98 (most alterations in original) (footnote and citation omitted); *see also Brown*, 142 F.3d 529; *United States v. Harbin*, 250 F.3d 532, 544 (7th Cir. 2001).

¶124 In *United States v. Pearson*, 203 F.3d 1243, 1261 (10th Cir. 2000), the court also concluded that the occur-

rence of structural error in one context does not mean that in another context the same constitutional violation is necessarily structural. Like the Second Circuit, the court held that whether error is structural depends not only on whether the constitutional right is violated, but also on the nature, context, and significance of the violation. *Id.* Then, carrying forward the *Yarborough* court's comments about *Rushen*, the Tenth Circuit explained that while the defendant's absence when the judge engaged in two conversations with a juror was subjected to harmless error review in *Rushen*, an unjustified exclusion of the defendant from an entire trial would constitute structural error. *Id.* This can hardly be doubted, serving to show that just because the Court has identified harmless error in one context does not mean the error would not be structural in another.

¶125 The dissent in *Paumier* shows that no structural error occurred there. *Paumier*, 176 Wn.2d at 49-52 (Wiggins, J., dissenting). The dissent examines the record and applies the same analysis used in *Momah*, establishing why the in-chambers voir dire in *Paumier* did not constitute structural error. *Paumier*, 176 Wn.2d at 51-52 (Wiggins, J., dissenting). The factual record shows that the limited private voir dire did not render the trial unfair and it did not turn the trial into an unreliable vehicle for determining guilt or innocence. *See id.* The same is true in *Wise*, and *Morris*. Thus, even though a violation of the public trial right may be structural error in some contexts, it is not in these cases.

¶126 In summary, even if a violation of the right to a public trial is structural error in some cases, it is not in these cases. First, nothing in the United States Supreme Court's decisions on the public trial right or on structural error demands that error in failing to conduct an inquiry into whether closure is justified must invariably be deemed structural error. The same should be true under article I, section 22. In the present cases, it is entirely possible that a posttrial inquiry, on the record or by remand for fact-finding

or a hearing, will show that no violation of the right to a public trial occurred. In this event, no structural error would have occurred, and none should be assumed in the absence of the after-the-fact inquiry.

¶127 Second, even though the violation of the public trial right is structural error in some contexts, it is not in all contexts, as this court held in *Momah*. The majorities in *Wise*, *Paumier*, and *Morris* should adhere to the holding in *Momah* that not every public trial violation is structural error. Finally, even if the ultimate conclusion in each of these cases is that a violation of the constitutional right to a public trial occurred, the error was not structural. If nothing else, the proceedings from the in-chambers questioning were transcribed as part of the public record. With this, the constitutional values were protected, as the Court explained in *Press-Enterprise*, and there can be no question of untoward conduct occurring during the closure.

Applying the Rules of Appellate Procedure; Failure To Object

¶128 The next area I discuss involves the effect of the failure to contemporaneously object to closure and the impact this has on the right to appellate review. My purpose in exploring this matter is again to show how strict this court's analysis of claimed violations of the public trial right is.

¶129 As explained above, under our rules review of a claimed error of constitutional magnitude is not necessarily forfeited if the defendant fails to object. Many courts in other jurisdictions hold, however, that the failure to object to closure precludes review entirely. That this is constitutionally permissible in the context of the right to a public trial is clear under decisions of the United States Supreme Court.

¶130 In the context of a due process right to a public proceeding that the Court said was akin to the Sixth Amendment right to a public trial, the Court held that the due process right was waived by the defendant's failure to request that the proceedings that were previously closed for

grand jury proceedings be opened for the criminal contempt proceeding that followed. *Levine v. United States*, 362 U.S. 610, 618-19, 80 S. Ct. 1038, 4 L. Ed. 2d 989 (1960). Then, in *Waller* itself, the Court made it clear that a state procedural bar to consideration of a claimed violation of the Sixth Amendment right to a public trial may apply in the absence of an objection. The Court explained that most of the defendants in the case objected to the closure but one did not (and in fact joined the prosecution in seeking closure).[36] The Court held that on remand the state courts could determine whether the nonobjecting defendant was procedurally barred from any relief. *Waller*, 467 U.S. at 42 n.2.

¶131 The fact that review of a claimed violation of the right to a public trial can be lost through the failure to object is not a remarkable premise. It is simply one of many rights that the Court has explicitly listed where appellate review can be forfeited through failure to object. In *Peretz v. United States*, 501 U.S. 923, 936-37, 111 S. Ct. 2661, 115 L. Ed. 2d 808 (1991), the Court observed:

> The most basic rights of criminal defendants are similarly subject to waiver. See, *e. g., United States* v. *Gagnon*, 470 U. S. 522, 528 (1985) (absence of objection constitutes waiver of right to be present at all stages of criminal trial); *Levine* v. *United States*, 362 U. S. 610, 619 (1960) (failure to object to closing of

---

[36] The Court explained in a footnote:

> Counsel for petitioners Waller, Thompson, Eula Burke, and W. B. Burke lodged an objection to closing the hearing. *Counsel for petitioner Cole concurred in the prosecution's motion to close the suppression hearing.* App. 14a, 15a. Respondent argues that Cole is precluded from challenging the closure. The Georgia Supreme Court appears to have considered the objections of all the petitioners on their merits. 251 Ga. 124, 126-127, 303 S. E. 2d 437, 441 (1983). Cole's claims in this Court are identical to those of the others. Since the cases must be remanded, we remand Cole's case as well. *The state courts may determine on remand whether Cole is procedurally barred from seeking relief as a matter of state law.*

*Waller*, 467 U.S. at 42 n.2 (emphasis added).

courtroom is waiver of right to public trial); *Segurola* v. *United States*, 275 U. S. 106, 111[, 48 S. Ct. 77, 72 L. Ed. 186] (1927) (failure to object constitutes waiver of Fourth Amendment right against unlawful search and seizure); *United States* v. *Figueroa*, 818 F. 2d 1020, 1025 (CA1 1987) (failure to object results in forfeiture of claim of unlawful post arrest delay); *United States* v. *Bascaro*, 742 F. 2d 1335, 1365 (CA11 1984) (absence of objection is waiver of double jeopardy defense), cert. denied *sub nom. Hobson* v. *United States*, 472 U. S. 1017 (1985); *United States* v. *Coleman*, 707 F. 2d 374, 376 (CA9) (failure to object constitutes waiver of Fifth Amendment claim), cert. denied, 464 U. S. 854 (1983). See generally *Yakus* v. *United States*, 321 U. S. 414, 444[, 64 S. Ct. 660, 88 L. Ed. 834] (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right").

In addition to these rights, the Court has found that the failure to object can also forfeit (often the word "waive" is used) the right to review of a claimed violation of the right of confrontation, and States may establish procedural rules governing the matter. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). And review of claimed violations of the rights to remain silent and to an attorney can be barred in postconviction proceeding under procedural default rules. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 359, 126 S. Ct. 2669, 165 L. Ed. 2d 557 (2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977)).

¶132 In fact, the Court's holding in *Waller* specifically reflects the recognition that the failure to object can preclude state review of a claimed violation of the public trial right. The Court said, "[W]e hold that under the Sixth Amendment any closure of a suppression hearing *over the objections of the accused* must meet the tests set out in *Press-Enterprise* and its predecessors." 467 U.S. at 47 (emphasis added). In the Court's most recent case involving the public trial right, *Presley*, 558 U.S. 209, there was a

contemporaneous objection. The Court has never indicated that appellate review is required in the absence of an objection. In accord with these decisions, numerous courts have held or recognized that the failure to contemporaneously object to a claimed violation of the right to a public trial can subject the claimed error to forfeiture rules on direct or collateral review.

¶133 Such cases include *Bucci v. United States*, 662 F.3d 18, 29 (1st Cir. 2011), *cert. denied*, 133 S. Ct. 277 (2012); *Downs v. Lape*, 657 F.3d 97 (2d Cir. 2011) (recognizing state procedural rule), *cert. denied*, 132 S. Ct. 2439 (2012); *United States ex rel. Bruno v. Herold*, 408 F.2d 125, 128-29 (2d Cir. 1969); *United States v. Bansal*, 663 F.3d 634, 661 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2700 (2012); *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006) (and noting that claim was of structural error); *Tillman v. Bergh*, 2008 WL 6843654, at *15, 2008 U.S. Dist. LEXIS 109968, at *43 (E.D. Mich. 2008) (unpublished); *Chase v. Berbary*, 404 F. Supp. 2d 457, 464 (W.D.N.Y. 2005); *Wright v. State*, 340 So. 2d 74, 79-80 (Ala. 1976) (accused may waive the right to a public trial expressly or by failing to object); *Fisher v. State*, 480 So. 2d 6, 7 (Ala. Crim. App. 1985) (same); *People v. Edwards*, 54 Cal. 3d 787, 812-13, 819 P.2d 436, 1 Cal. Rptr. 2d 696 (1991); *People v. Lang*, 49 Cal. 3d 991, 1028, 782 P.2d 627, 264 Cal. Rptr. 386 (1989); *People v. Bradford*, 14 Cal. 4th 1005, 1046-47, 929 P.2d 544, 60 Cal. Rptr. 2d 225 (1997); *Mansingh v. State*, 68 So. 3d 383 (Fla. Dist. Ct. App. 2011); *Alvarez v. State*, 827 So. 2d 269, 273-76 (Fla. Dist. Ct. App. 2002); *Hunt v. State*, 268 Ga. App. 568, 571, 602 S.E.2d 312 (2004); *State v. Loyden*, 04-1558, 899 So. 2d 166, 179 (La. App. 3 Cir. 4/6/05); *Robinson v. State*, 410 Md. 91, 976 A.2d 1072 (2009) (stating that the fact structural error is involved does not mandate appellate review); *Commonwealth v. Cohen*, 456 Mass. 94, 105-06, 921 N.E.2d 906 (2010) (court looks to whether defendant raised claim of violation of right to a public trial in a timely matter because, like other structural rights, can be waived); *Commonwealth v. Wells*,

360 Mass. 846, 274 N.E.2d 452 (1971); *People v. Vaughn*, 491 Mich. 642, 821 N.W.2d 288 (2012); *People v. Pollock*, 50 N.Y.2d 547, 550, 407 N.E.2d 472, 429 N.Y.S.2d 628 (1980); *People v. Marathon*, 97 A.D.2d 650, 469 N.Y.S.2d 178 (1983); *State v. Butterfield*, 784 P.2d 153, 155-57 (Utah 1989).

¶134 Thus, review of even so highly valued a right as the right to a public trial may be procedurally barred in other jurisdictions when the defendant fails to object to closure.

¶135 This court, however, has repeatedly held that an objection is not required to preserve this claimed error in our state courts. *E.g.*, *Brightman*, 155 Wn.2d at 514-15; *Orange*, 152 Wn.2d at 800; *Bone-Club*, 128 Wn.2d at 257. This conclusion is consistent with review of other claims of violations of constitutional rights under the rules. As explained above, under RAP 2.5(a), the court will address manifest error affecting a constitutional right for the first time on appeal. But the holdings in *Brightman*, *Orange*, and *Bone-Club* are not based on RAP 2.5(a) but instead on *Marsh*.

¶136 Permitting review of unobjected-to claimed constitutional error is within the scope of our appellate rules, as the court acknowledged in *State v. Easterling*, 157 Wn.2d 167, 173 n.2, 137 P.3d 825 (2006). *Easterling* involved a claimed violation of the public trial right, and the court seemed in that case to be on track with its own rules, saying that " '[w]e have the discretion to review an issue raised for the first time on appeal when it involves a manifest error affecting a constitutional right.' " *Id.* (quoting RAP 2.5(a) and citing RAP 13.4). But rather than following the rule, the majority in *Paumier* says that "RAP 2.5(a) does not apply in its typical manner here." *Paumier*, 176 Wn.2d at 36. This is the point at which the majority sweeps the entire scheme of appellate review under the rules aside with the conclusion that structural error occurs when no *Bone-Club* inquiry is made on the record at the time of closure. With this breathtaking, and incorrect, conclusion, the majority completely dispenses with the rules for addressing constitutional error on review.

¶137 When RAP 2.5(a) is actually followed, the defendants in *Wise* and *Paumier* lose their cases, even assuming the in-chambers partial voir dire violated the right to a public trial. This is because, as explained by the dissent in *Paumier* and Justice Wiggins' concurrence in *Sublett*, these defendants have not established practical and identifiable consequences to the trial of the case—they have not established they were actually prejudiced by the in-chambers limited, private questioning of some of the members of the venire. *Paumier*, 176 Wn.2d at 55-56 (Wiggins, J., dissenting); concurrence (Wiggins, J.) at 150-51.

## The Ineffective Assistance Claim in *Morris*

¶138 *Morris* is here on collateral review of claims that the petitioner's right to a public trial was violated by the limited questioning of some prospective jurors in chambers on sensitive subjects and that his appellate counsel was ineffective for failing to raise the violation on direct review. The majority concludes that the case is analytically indistinguishable from *Orange* and as in *Orange* reversal and a new trial are required.

¶139 Insofar as the bare claim of a violation of the right to a public trial is concerned, this case is no different from *Wise* and *Paumier*. The error is not necessarily a violation of the right to a public trial that must be equated to structural error because there has been no determination whether closure was justified. At most, error consists of the failure to conduct the *Bone-Club* inquiry and the appropriate course at this point is to carry out this inquiry if possible. I believe this can be done on the existing record, as explained, but alternatively a reference hearing should be ordered in this case for the purposes of determining whether the closure was justified.[37] There is simply no constitutionally founded basis that forbids an after-the-fact inquiry into whether the in-chambers questioning was justified.

---

[37] But as explained above, unlike the court's approach in *Orange,* we should consider the resulting findings on whether closure was justified.

¶140 As to the ineffective assistance claim, the dissent by Justice Wiggins shows that this case is factually unlike *Orange*. In *Orange*, there was an objection at trial to the closure but appellate counsel failed to raise the issue on appeal, with no conceivable strategic reason for failing to do so. The dissent explains that the alleged error in *Orange* was conspicuous in the record.

¶141 I add that in the present case there is an obvious basis for believing that closure was justified, and this also distinguishes this case from *Orange*. *Orange* should not compel the result in this case.

¶142 Moreover, when the claim is that counsel was ineffective at trial for failing to object to closure, other courts have remanded for evidentiary hearings on relevant matters. In the habeas proceeding in *Owens v. United States*, 483 F.3d 48, 61-66 (1st Cir. 2007), the court was faced with claims that trial and appellate counsel were ineffective for failing to raise the issue of a violation of the petitioner's right to a public trial. The court remanded for an evidentiary hearing, in part to determine whether the trial was actually closed. *Id.* at 66.

¶143 In *Johnson v. Sherry*, 586 F.3d 439, 444-46 (6th Cir. 2009), also a federal habeas case, the court granted the prosecution's motion to close the courtroom on the ground that two witnesses had been killed and others were afraid to testify, and defense counsel acquiesced in closure despite the court's reluctance to close the courtroom. The petitioner argued that despite his counsel's failure to object, his public trial claim was not defaulted because his counsel was constitutionally ineffective in failing to object to closure. The court was skeptical about whether the closure was justified and uncertain whether there might have been a strategic reason for failing to object, for example knowledge that the defendant's family members had a history of contact with witnesses or other facts than what the record showed. *Id.* at 446. The court remanded for an evidentiary hearing on the issue whether closure was justified, which

would bear on whether counsel was ineffective for failing to object.

¶144 As in these cases, a reference hearing in Mr. Morris's case could address the question whether closure was justified.

¶145 As to the prejudice prong of the ineffectiveness analysis, courts have held that when the denial of a public trial is the foundation of a claim of ineffective assistance of counsel, actual prejudice to the outcome of the case must be shown, in the sense of having an impact on the outcome of the trial. In *Purvis v. Crosby*, 451 F.3d 734 (11th Cir. 2006), a habeas petitioner argued that his counsel was ineffective for failing to object to closure of the courtroom during testimony of the young victim. The court explained that assuming the partial closure in the case at hand was a structural defect for which no showing of prejudice was required on direct review, the same was not true for a claim raised on collateral review in the context of an ineffective assistance of counsel claim based on counsel's failure to object to closure. *Id.* at 740. The court found this conclusion to be necessary under *Strickland v. Washington*, 466 U.S. 668, 692-93, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), where the Court explained the limited circumstances in which prejudice must be assumed but directed that in other circumstances attorney errors "cannot be classified according to likelihood of causing prejudice." The three circumstances identified by the Court are (1) " '[a]ctual or constructive denial of the assistance of counsel altogether,' " (2) " 'various kinds of state interference with counsel's assistance,' " and (3) "where counsel is burdened by conflicting interests arising from multiple representation[s]." *Purvis*, 451 F.3d at 740-41 (quoting *Strickland*, 466 U.S. at 692).[38] The Eleventh Circuit concluded:

---

[38] The Court in *Strickland* stated:

    In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed

We cannot hold that attorney error in failing to object to the closure of the courtroom is so likely to result in prejudice that we will presume it . . . . We cannot dispense with the prejudice requirement for attorney error of this type without defying the Supreme Court's clear holding that except in three limited circumstances, which are not present here, a defendant must show that any error his counsel committed "actually had an adverse effect on the defense."

*Purvis*, 451 F.3d at 741 (quoting *Strickland*, 466 U.S. at 693); *accord Torres v. McNeil*, 2010 WL 5849880, at *19-21, 2010 U.S. Dist. LEXIS 141398, at *21-24 (N.D. Fla. 2010) (where

to result in prejudice. So are various kinds of state interference with counsel's assistance. See *United States* v. *Cronic*, [466 U.S. 648,] 659, and n. 25[, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)]. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. [466 U.S.] at 658. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler* v. *Sullivan*, 446 U. S.[ 335,] 345-350[, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)], the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, *e. g.*, Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*[, 446 U.S. at 350] (footnote omitted).

Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

*Strickland*, 466 U.S. at 692-93.

denial of a public trial is the basis for a claim of ineffective assistance of counsel, prejudice to the outcome, i.e., the determination of guilt, must be shown); *Tillman*, 2008 WL 6843654, at *14 n.5, 2008 U.S. Dist. LEXIS 109968, at *42 n.5 (notwithstanding fact that a public trial claim is not subject to harmless error review, when a petitioner contends that counsel was ineffective for failing to object to closure of the courtroom prejudice must still be established); *see also Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006) (declining to hold in the context of a claim of ineffective assistance of counsel that structural error is sufficient alone for a presumption of prejudice).

¶146 Other courts have disagreed. The court in *Owens*, 483 F.3d at 64, concluded that a violation of the right to a public trial is structural error and it is impossible to determine whether structural error is prejudicial; therefore, assuming the failure to object was not a strategic decision, actual prejudice need not be shown. *Id.*; *accord Johnson*, 586 F.3d at 447.

¶147 As Justice Wiggins' dissent in *Morris* explains, this court has declined to hold that per se reversible error on direct appeal requires reversal on collateral review. *Morris*, 176 Wn.2d at 181-82 (Wiggins, J., dissenting); *see In re Pers. Restraint of Pierre*, 118 Wn.2d 321, 823 P.2d 492 (1992). This strongly suggests that on collateral review this court should not presume prejudice from the nature of the error.

¶148 Moreover, while I recognize the difficulty of determining prejudice where denial of the right to a public trial is at issue, there are distinctions that can be drawn. Here, the record shows that only a limited part of voir dire was closed, that the proceedings during this time were recorded and transcribed, and that the balance of voir dire was conducted in open court where the jury was finally selected. Because of these circumstances, the values underlying the right to a public trial were not impaired by the limited closure that occurred, as I explain above. I believe that the

facts in this case do not support a presumption of prejudice on collateral review.[39]

¶149 In the end, the court cannot say definitively that the defendant was denied his right to a public trial. Rather, the most that can be said is that there was no determination on the record as to whether the limited closure was justified. I would, as explained above, engage in the *Bone-Club* analysis on the record in this case and conclude that no unjustified closure occurred. This aside, however, the court should not conclude that appellate counsel was ineffective without ordering a reference hearing to determine whether any unjustified closure occurred. The court's findings entered after such a hearing should be accorded deference.

### Assuming That the Failure To Engage in the *Bone-Club* Inquiry Itself Is an Independent Violation of the Right to a Public Trial, What Is the Appropriate Remedy?

¶150 Finally, I briefly turn to the issue of what remedy should be provided if the right to a public trial exists solely of an independent right to the *Bone-Club* inquiry itself without regard to whether a closure was in fact justified, when no on-the-record inquiry was made at the time of closure. As the court explained in *Momah*:

---

[39] It is illuminating to compare application of a presumption of prejudice on collateral review in *Morris* when the only error consists of failing to conduct the on-the-record inquiry, to the review standard applied on direct review to many claims of violations of many important constitutional rights. Harmless error analysis applied in context of (1) the right to remain silent: *State v. Burke*, 163 Wn.2d 204, 222-23, 181 P.3d 1 (2008); *State v. Easter*, 130 Wn.2d 228, 242-43, 922 P.2d 1285 (1996); *State v. Sweet*, 138 Wn.2d 466, 481, 980 P.2d 1223 (1999); (2) the right to confront witnesses: *State v. Koslowski*, 166 Wn.2d 409, 431-32, 209 P.3d 479 (2009); *State v. Mason*, 160 Wn.2d 910, 927, 162 P.3d 396 (2007); (3) the right to compel the attendance of witnesses: *State v. Maupin*, 128 Wn.2d 918, 928-30, 913 P.2d 808 (1996); (4) the right to be present at all critical stages of the trial: *State v. Irby*, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011); and (5) the right to present a defense: *State v. Jones*, 168 Wn.2d 713, 230 P.3d 576 (2010).

Of course, I do not mean to imply that the right to a public trial, when the courtroom is closed without justification, is subject to a harmless error standard; it is not. But my comparison is to show the incongruity of applying on collateral review a presumption of prejudice in *Morris*, when the only violation that can at this point be said to have occurred is the failure to conduct a *Bone-Club* inquiry.

In *Waller*, the trial court closed the courtroom for a suppression hearing over the objections of the defendant and, on review, the Supreme Court held that the defendant was entitled to a new suppression hearing, but not automatically a new trial. The Court reasoned that "the remedy should be appropriate to the violation" and if it were to automatically grant a new trial without requiring a new hearing, the result would be a "windfall for the defendant" and would thus "not [be] in the public interest." *Waller*, 467 U.S. at 50. The Court did *not* conclusively presume prejudice and grant automatic reversal of the defendant's conviction and a new trial. Rather, in *Waller*, the Court required a showing that the defendant's case was actually rendered unfair by the closure.

*Momah*, 167 Wn.2d at 150 (alteration in original).

¶151 Accordingly, the remedy in these cases should be appropriate to the violation. The only violation that the majorities identify in these cases is the failure to conduct the on-the-record *Bone-Club* inquiry. Remedying this error requires only that such an inquiry occur. Accordingly, even viewing the need for a *Bone-Club* inquiry as an independent constitutional right, the appropriate course in these cases is still an after-the-fact *Bone-Club* inquiry, either on the record or through remand for fact-finding or a hearing. This course is analogous to the remedy in *Waller*, where the Court determined there was at least to some extent an unjustified closure, and then remanded for a new suppression hearing preceded by an inquiry into how much, if any, of the new hearing should be closed. The majorities' insistence that a new trial is required does not accord with *Momah* or *Waller*.

¶152 In summary, even assuming that the failure to conduct the *Bone-Club* inquiry is the constitutional violation in these cases, the appropriate remedy is a *Bone-Club* inquiry. Once this remedy is afforded in each case, the closure either will be found to be justified, which would completely resolve any public trial claim, or it will be found not justified or indeterminable. Only in the latter two instances is there a need to consider any further remedy.

## Conclusion

¶153 I concur in the decision in *Sublett* that the right to a public trial is not implicated when, in chambers and with counsel present, the trial judge considers a question submitted by the jury during the course of its deliberations.

¶154 I have written extensively on various issues regarding the right to a public trial as they have been raised in the four cases currently before the court involving claims of violations of the right to a public trial. In addition, I have written in each of these cases to summarize the important aspects of these cases and the important legal questions posed. We are at something of a crossroads in our jurisprudence respecting the right to a public trial. We are faced with a case, *Sublett*, where there is little to favor the conclusion that the right to a public trial has been violated. How do we best explain why and when the right to a public trial is not implicated by matters or procedures occurring during a criminal trial?

¶155 The three voir dire cases before us are, with very little doubt, cases where the closures would be found justified, had the proper *Bone-Club* inquiry occurred prior to the limited in-chambers questioning of a few potential jurors on sensitive matters. In *Wise, Paumier*, and *Morris*, must we adhere to the harsh rule we have set up that the mere failure to make the inquiry is a constitutional violation of the worst kind, mandating reversal of the defendants' convictions and reversals for new trials?

¶156 Will we continue to disregard our own Rules of Appellate Procedure, giving them effect only in word, and not substance, when the public trial right cases come before us? As explained in this opinion and in the dissenting opinions in *Wise, Paumier*, and *Morris*, it is possible to give all aspects of the public trial right and all aspects of our appellate rules effect. Will we do so?

¶157 STEPHENS, J. (concurring) — While I concur in the result reached by the lead opinion and believe considerations of logic and experience appropriately guide the determination of when the public trial right attaches, we must carefully focus our analysis. I write separately because I disagree with the lead opinion that "the approach used by the Court of Appeals somewhat parallels the approach we use." Lead opinion at 71-72. Application of the public trial right does not turn on whether a proceeding involves fact-finding or only legal issues. This distinction, relied on by the court below, sells short the public trial right and should be rejected. I also write separately to address Justice Wiggins's argument that the failure to lodge a contemporaneous objection to a court closure precludes appellate review of a public trial claim under RAP 2.5(a)(3).

### The Court of Appeals Distinction between Fact-Finding and Legal Proceedings Erodes the Public Trial Right

¶158 The Court of Appeals decision mainly follows the reasoning of *State v. Sadler*, 147 Wn. App. 97, 193 P.3d 1108 (2008) (petition for review deferred pending *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012)). In particular, the opinion holds that under *Sadler*, a defendant has no right to a public hearing on " 'purely ministerial or legal issues that do not require the resolution of disputed facts.' " *State v. Sublett*, 156 Wn. App. 160, 181, 231 P.3d 231 (2010) (quoting *Sadler*, 147 Wn. App. at 114).[40] As the lead opinion notes, the view expressed in *Sadler* is gaining acceptance in the

---

[40] Additionally, the Court of Appeals stated that "questions from the jury to the trial court regarding the trial court's instructions are part of jury deliberations and, as such, are not historically a public part of the trial." *Sublett*, 156 Wn. App. at 182. There is no authority for this proposition; the cited cases address the secrecy of jury deliberations and not the questions submitted by the jury during deliberations. Just as jury instructions are part of the public trial, so too are any answers to jury questions or further instructions given after deliberations have begun. Indeed, CrR 6.15(f)(1) itself recognizes that "[w]ritten questions from the jury, the court's response and any objections thereto shall be made a part of the record" and that "[t]he court shall respond to all questions from a deliberating jury in open court or in writing."

Court of Appeals, with several opinions adopting the view that the public trial right does not attach to proceedings that involve only legal issues. *See* lead opinion at 72 (collecting cases); *see also State v. Castro*, 159 Wn. App. 340, 344, 246 P.3d 228 (2011) (holding closed pretrial hearing did not implicate public trial right because "the matters addressed did not involve any fact finding required to be open to the public").

¶159 The view that proceedings on legal issues need not be open misapprehends our public trial precedent, and we need to take this opportunity to clarify the law. As articulated in *Sadler*, the legal/factual distinction derives from a conflation of two separate concepts, one involving the defendant's right to be present and the other involving the right to a public trial. With respect to the right to be present, it is well settled that a defendant has no due process right to be present at chambers conferences on legal issues where such presence bears no reasonably substantial relationship to the opportunity to defend in person. *See In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994); *United States v. Gagnon*, 470 U.S. 522, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985). *Sadler* acknowledges this authority and then reasons that "[t]he right to a public trial is linked to the defendant's constitutional right to be present during critical phases of trial." 147 Wn. App. at 114. Such linkage is not itself the problem, but *Sadler* uses it to equate the distinction between trial matters and ministerial matters that is relevant to the public trial inquiry with the distinction between legal and factual issues that sometimes helps determine whether the defendant's presence at a chambers or bench conference is required. *Id.* These are separate concepts.

¶160 Proof of the blurring of these separate concepts can be found in *Sadler*'s serial citations to *State v. Rivera*, 108 Wn. App. 645, 32 P.3d 292 (2001) and *State v. Bremer*, 98 Wn. App. 832, 991 P.2d 118 (2000) as supporting its point. In part, *Rivera* is the source of the confusion. That case

considered whether a public trial violation occurred when the trial judge closed the courtroom to address a juror's concern about another juror's poor hygiene. *Rivera* properly held that such administrative or ministerial matters arising at trial need not be addressed in open court. 108 Wn. App. at 653. During the course of its discussion, however, the court cited to *Bremer*, a case involving the defendant's right to be present, for the proposition that a defendant generally has no right to be present at a chambers or bench conference on legal issues. *Id.* The court then stated, without any citation, that where the defendant does not have a right to be present, there can be no right to have the public present. *Id.*

¶161 *Sadler* took this reasoning one step further and announced the "rule" that "[a] defendant does not . . . have a right to a public hearing on purely ministerial or legal issues that do not require the resolution of disputed facts." 147 Wn. App. at 114. The opinion below in this case illustrates the common holding of cases that follow *Sadler*: the faulty conclusion that the public trial right does not attach to hearings on matters that are legal in nature and do not require the resolution of disputed facts. *Sublett*, 156 Wn. App. at 182.

¶162 Consider the array of legal issues a trial judge may address during a criminal trial. In addition to jury instructions (or by extension how to answer a jury's question regarding the instructions), the judge may need to decide motions to amend the charges, to dismiss, to allow the defendant to proceed pro se, to disallow evidence, or to suppress. Often such motions will proceed on stipulated facts. Indeed, the *trial itself* may proceed on stipulated facts following CrR 3.5 or 3.6 motions. Never has this court held that such obviously critical parts of a criminal trial may occur in private because they do not involve the resolution of disputed facts. The legal/factual distinction is simply out of place in the context of the right to a public trial. We should take this opportunity to reject the distinction drawn

by the Court of Appeals and clarify that the only recognized exception to the public trial right grounded in the *type of issue involved* is the one actually applied in *Rivera*: administrative or ministerial matters arising during trial need not be addressed in open court.

¶163 At the same time, we must caution against equating the scope of the public trial right with the scope of the defendant's right to be present. The latter right is grounded in due process principles and is reviewed as trial error, subject to harmless error analysis. *See Gagnon*, 470 U.S. 522. The public trial right, in contrast, is not subject to harmless error analysis. *See, e.g.*, *Waller v. Georgia*, 467 U.S. 39, 49-50 & n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); *State v. Bone-Club*, 128 Wn.2d 254, 261, 906 P.2d 325 (1995); *State v. Easterling*, 157 Wn.2d 167, 181, 137 P.3d 825 (2006). Moreover, we have repeatedly recognized that "the right to a public trial applies to all judicial proceedings." *State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010). We have never held that if the defendant can be excluded without offending his due process rights, then there is no public trial right. In fact, we rejected an analogous notion in *Rufer v. Abbott Laboratories*, 154 Wn.2d 530, 549, 114 P.3d 1182 (2005) (rejecting the rule that "if the jury does not see it, the public does not see it" and emphasizing the value of public proceedings to instill trust and confidence in the judicial system). The benefits of a public trial sweep more broadly than the defendant's due process interests. *See In re Oliver*, 333 U.S. 257, 270 n.25, 68 S. Ct. 499, 92 L. Ed. 682 (1948) (" ' "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . ." ' " (quoting *People v. Murray*, 89 Mich. 276, 291, 50 N.W. 995 (1891) (quoting 1 Thomas M. Cooley, A Treatise on Constitutional Limitations 647 (8th ed. 1927)))).

¶164 Recognizing that the rule announced in *Sadler* draws an improper line between legal and factual issues in determining when a public hearing is required, our task is to articulate where the proper line should be drawn. I believe the distinction between ministerial matters and adversarial proceedings is helpful in highlighting the obvious truth that some matters, such as issues of scheduling, juror hygiene, or trial management, are properly handled in chambers. Similarly, courts often hold brief sidebars to allow counsel to raise concerns that may need to be taken up outside the jury's presence.

¶165 Conferences on proposed jury instructions are of particular interest here. It has been common practice in both criminal and civil trials to have counsel submit a set of proposed jury instructions for the trial judge to review. *See* CR 51. These proposed instructions are not necessarily put into the record but are discussed informally, often with counsel in chambers. Importantly, however, once the court determines which instructions it will give, the matter is taken up in open court so that counsel can lodge objections and enter proposed but rejected instructions into the record, and the court can explain its rulings if necessary. In criminal cases, the defendant's presence is not required at such conferences or when the court's decision is put on the record.

¶166 When the jury submits a question about the jury instructions, the court in some sense must conduct what amounts to a supplemental jury instruction conference. After all, the issue is whether the given instructions need to be clarified or the jury further instructed. The procedure described in CrR 6.15(f)(1) states that the jury's questions must be in writing and "[w]ritten questions from the jury, the court's response and any objections thereto shall be made part of the record." Further, "[t]he court shall respond to all questions from a deliberating jury in open court or in

writing," and "[a]ny additional instruction upon any point of law shall be given in writing."[41] *Id.*

¶167 The central question in this case is whether the public trial right attaches to the chambers conference. As noted, this question is distinct from the question of whether the defendant has a constitutional right to be present, an issue not raised here. I believe the answer to this question should be the same for a hearing responding to a jury question about the instructions as for a hearing addressing jury instructions in the first instance. Thus, if the public trial right is not offended by holding an in-chambers conference to discuss jury instructions before returning to the courtroom to put matters on the record, then it is not offended when the judge considers a question from a deliberating jury with counsel in chambers before entering the matter in the record. CrR 6.15(f)(1) seems to implement the constitutional requirement, though it is undoubtedly true that "the court rule operates within the confines of the state and federal constitutional protections guaranteeing an open and public trial." Sublett Pet. for Review at 8.

¶168 I believe the lead opinion is correct to reject any litmus test for deciding when a particular proceeding implicates the public trial right. Given the connection between a defendant's public trial right and the public's right of access under First Amendment principles, I agree that the logic and experience analysis is helpful. Conceptually, this analysis is similar to the historical analysis we have used in other contexts to determine when a constitutional right attaches. *See, e.g., Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 771 P.2d 711 (1989). It stands to reason that in evaluating whether the public trial right attaches to a particular hearing, courts should look at the historical context in

---

[41] CrR 6.15(f)(1) also contemplates jury questions about the evidence. It recognizes the trial court's discretion to allow the jury to rehear or replay evidence. Notably, we have said that when a court accommodates the jury's request in this regard, the defendant should be present. *State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983). I could find no case where evidence was replayed for the jury other than in open court.

which such a hearing has occurred (i.e., whether in open court or in chambers), as well as the nature of the interests involved and "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986).

¶169 Considerations of logic and experience allow for a qualitative evaluation of the public trial right, focused on the societal interests advanced by open court proceedings. The lead opinion numbers these interests at four, while Sublett suggests there are six, *see* Sublett Suppl. Br. at 13-14, but however the catalog is numbered, the core value of the public trial right is to ensure open justice, recognizing that "[a] trial is a public event" and that "[w]hat transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947).[42] Because I agree that the procedure followed by the trial court in this case was consistent with CrR 6.15(f)(1) and the public trial right, I concur in the result reached by the lead opinion.

### RAP 2.5(a)(3) Does Not Preclude Review of an Alleged Public Trial Violation

¶170 The lead opinion wisely does not address the issue that forms the basis of Justice Wiggins's concurrence, namely whether a criminal defendant's failure to object to a closure at trial precludes review under RAP 2.5(a)(3). But, the lead opinion should not be read as endorsing this

---

[42] I disagree with the lead opinion's conclusion that *none* of the values served by open court proceedings are implicated here. *See* lead opinion at 77. While this proceeding did not involve witnesses or fact-finding, openness promotes public understanding of the judicial system and the perception of fairness, reminds the court and counsel of their responsibilities, and serves as a check on bias or corruption. The record here is adequate to give us confidence that these values were secured by the procedure the trial court followed. Consistent with CrR 6.15(f)(1), the court made a public record of the jury's question, the court's response, and counsel's agreement with that response. I agree with the lead opinion that what happened here is consistent with historical practice and does not offend traditional notions of openness.

possibility. The State has not asserted RAP 2.5(a)(3) for good reason. We have repeatedly and conclusively rejected a contemporaneous objection rule in the context of the public trial right. *Bone-Club*, 128 Wn.2d at 261 (holding trial court must inform defendant of his right to a public trial before he can object to a closure); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 806, 100 P.3d 291 (2004) (citing *Bone-Club* to reject waiver argument and holding that anyone present at the time of the closure motion must be given an opportunity to object); *Easterling*, 157 Wn.2d at 176 n.8 (noting defendant does not waive public trial right by failing to make a contemporaneous objection); *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005) (holding defendant's failure to object at trial to courtroom closure does not amount to waiver); *Momah*, 167 Wn.2d at 154-55 (agreeing that defendant's failure to object to closure did not constitute waiver of right to public trial);[43] *State v. Strode*, 167 Wn.2d 222, 229, 217 P.3d 310 (2009) (plurality opinion) (same).

¶171 Notably, in analyzing whether a contemporaneous objection is necessary to preserve a public trial right claim, we have already considered and rejected using RAP 2.5(a) as a procedural bar to review. *See Easterling*, 157 Wn.2d at 173 n.2 ("A criminal accused's rights to a public trial and to be present at his criminal trial are issues of constitutional magnitude that may be raised for the first time on appeal." (citing RAP 2.5(a), *Orange*, and *Bone-Club*)). In the face of our clear precedent, Justice Wiggins's reliance on RAP 2.5(a)(3) is alarming. Concurrence (Wiggins, J.) at 150-51.

¶172 The way to secure a valid waiver of the public trial right is set forth in the *Bone-Club* analysis. 128 Wn.2d at 261 (holding court may secure waiver after advising defendant of his public trial right); *Easterling*, 157 Wn.2d at 176

---

[43] The court in *Momah* did not preclude the defendant from asserting his public trial right on appeal notwithstanding that "Momah affirmatively accepted the closure, argued for the expansion of it, actively participated in it, and sought benefit from it." 167 Wn.2d at 156; *see also id.* at 155 (noting that "Momah is correct in terms of the ability to raise the issue"). Certainly, then, the mere failure to object to a closure cannot preclude appellate review.

n.8 ("[U]nder the *Bone-Club* criteria, the burden is placed upon the trial court to seek the defendant's objection to the courtroom closure."). Indeed, this was a key point of agreement between the lead and concurring opinions in *Strode*, which joined in holding that the defendant did not knowingly waive his public trial right. 167 Wn.2d at 229 (lead opinion), 235 (Fairhurst, J., concurring).

¶173 Unlike Justice Wiggins, I do not believe we have "ignored RAP 2.5 in the context of open trial violations." Concurrence (Wiggins, J.) at 152. Rather, we have looked at the waiver question and RAP 2.5 in conjunction with each other, consistently reviewing claims of closure raised for the first time on appeal. *See Easterling*, 157 Wn.2d at 173 n.2 (finding issue of constitutional magnitude under RAP 2.5(a)), 176 n.8 (noting failure to object is not waiver and trial court has affirmative obligation to provide opportunity to object before ordering closure); *Momah*, 167 Wn.2d at 155 (noting that "Momah is correct in terms of the ability to raise the issue," though "being able to raise an issue on appeal does not automatically mean reversal is required"). While there is a technical distinction between waiver and forfeiture so that it is possible to forfeit a right one has not waived, the terminology is often used interchangeably. *See Kontrick v. Ryan*, 540 U.S. 443, 458 n.13, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004). The important point is not the nomenclature but the fact that neither this court nor the United States Supreme Court has ever invoked a plain error procedural rule to avoid addressing the merits of a public trial claim. This stands to reason because such procedural rules fundamentally involve considerations of harmless error, to which public trial error has never been subject. *See Waller*, 467 U.S. at 49 n.9 (" 'The harmless error rule is no way to gauge the great, though intangible, societal loss that flows' from closing courthouse doors." (quoting *People v. Jones*, 47 N.Y.2d 409, 416, 418 N.Y.S.2d 359, 391 N.E.2d 1335 (1979))); *accord Bone-Club*, 128 Wn.2d at 261-62 ("Prejudice is presumed where a violation of the

public trial right occurs."). I believe it is important to emphasize that we have been over this ground, and we have consistently rejected the argument Justice Wiggins would embrace.

¶174 I concur in the result to affirm the Court of Appeals.

FAIRHURST, J., and ALEXANDER, J. PRO TEM., concur with STEPHENS, J.

¶175 WIGGINS, J. (concurring in result) — I concur in the result the lead opinion reaches. I write separately because I believe the experience and logic test the lead opinion adopts conflicts with our constitution. Article I, section 10 of our constitution says that justice must be done in the open, and I believe the experience and logic test confounds this mandate. But I would also hold that a defendant who raises a public trial issue for the first time on appeal must satisfy the requirement of RAP 2.5(a)(3) of showing "manifest error affecting a constitutional right."

I.   Article I, section 10 is a uniquely strong mandate for openness at every stage of a judicial proceeding

¶176 Washington's article I, section 10 is unique among American constitutions. It commands, "Justice in all cases shall be administered openly, and without unnecessary delay." CONST. art. I, § 10. This language strongly commits Washington to the open administration of justice.

¶177 Anyone doubting the strength of this commitment need look only to the origins of the clause. Article I, section 10 is derived through a series of metamorphoses of the Magna Carta. At the time of our Constitutional Convention in 1889, many other states had adopted the so-called "open courts" clauses in their constitutions, most of which can be traced to the Magna Carta. *See* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts*

*Clause of State Constitutions*, 74 OR. L. REV. 1279, 1284-86 (1995). These clauses were designed to ward off corruption and manipulation in the administration of justice. *Id.* at 1294-95. The rationale behind them is that public scrutiny can serve as a check on abuse of judicial power and enhance public trust in the judicial system. *E.g., Dreiling v. Jain*, 151 Wn.2d 900, 915, 93 P.3d 861 (2004) (stating that the policy for granting public access to courts " 'relate[s] to the public's right to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system' " (quoting *In re Cont'l Ill. Secs. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984))).

¶178 Our article I, section 10 draws from these clauses and hence ultimately from the Magna Carta, but with a unique emphasis on open proceedings. Our clause is loosely based on Oregon's open courts clause, which says, "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation." OR. CONST. art. I, § 10. Oregon's clause also derives from the Magna Carta, *see* Hoffman, *supra*, at 1284-86, but Oregon appears to be the only state that uses the exact phrase "justice shall be administered openly" other than Washington, which modeled its open courts clauses after Oregon's, and Arizona, which followed Washington. *See* John H. Bauman, *Remedies Provisions in State Constitutions and the Proper Role of the State Courts*, 26 WAKE FOREST L. REV. 237, 284-88 (1991) (collecting open courts provisions).

¶179 The first draft of our constitution, known as the "Hill draft," included this clause in its entirety. *See generally* Janice Sue Wang, *State Constitutional Remedy Provisions and Article I, Section 10 of the Washington State Constitution: The Possibility of Greater Judicial Protection of Established Tort Causes of Action and Remedies*, 64 WASH. L. REV. 203, 215 n.61 (1989) (citing JOURNAL OF THE WASHINGTON STATE CONSTITUTION CONVENTION, 1889, at 51, 499 n.18 (B. Rosenow

ed. 1962)). However, our framers did not adopt the whole clause, choosing to adopt only the open administration of justice language, which was unique at the time. *Id.* Thus, our constitution contains a stand-alone open administration of justice clause that was entirely unique to our constitution when it was adopted.[44] This suggests our framers were especially preoccupied with the open administration of justice.

¶180 Under article I, section 10, *every part* of the administration of justice is presumptively open. Section 10 says that justice in *all cases* must be administered openly, the purpose being to ward off corruption and enhance public trust in our judiciary. CONST. art. I, § 10; *Dreiling*, 151 Wn.2d at 915. These concerns are at play during each and every stage of a judicial proceeding, whether it be cross-examination, a clarifying question from the jury to the judge, or any other proceeding. At any stage, absence of public scrutiny could "breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (Brennan, J., concurring). Thus, every stage of judicial proceedings must be presumptively open under our constitution. The only exception to this principle is that a judge may close a courtroom after conducting a *Bone-Club* hearing. *See State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

¶181 Article I, section 10's broad mandate for openness must inform our interpretation of the right to a public trial under article I, section 22. Indeed, as we have said, "The section 10 guaranty of public access to proceedings and the section 22 public trial right serve complementary and interdependent functions in assuring the fairness of our judicial system." *Id.* at 259. These two clauses must be read in tandem. This does not mean a defendant can assert

---

[44] Arizona has since enacted an identical provision in its constitution. *See* ARIZ. CONST. art. II, § 11 ("Justice in all cases shall be administered openly, and without unnecessary delay.").

different rights under the two clauses, it means only that section 10 necessarily illuminates the meaning of section 22.

## II. The experience and logic test fails to account for article I, section 10

¶182 The experience and logic test is a creature of the federal courts that has no place within our state's constitutional scheme. We have recognized in the past that article I, section 10 requires us to interpret open courts differently than the federal courts. *See Rufer v. Abbott Labs.*, 154 Wn.2d 530, 549, 114 P.3d 1182 (2005) ("There is good reason to diverge from federal open courts jurisprudence where appropriate. While our state constitution has an explicit open courts provision, there is no such counterpart in the federal constitution . . . ."). Because the United States Constitution has no open administration of justice clause, the Sixth Amendment right to a public trial has been construed in a constitutional context that is far different from our own. *Id.* In short, the United States Supreme Court is much freer to limit courtroom openness than we are.[45]

¶183 With this in mind, I would reject the experience and logic test because it is contrary to the plain language of article I, section 10. We cannot say, on the one hand, that justice must always be administered openly, but that on the other hand certain stages of a proceeding can be closed to the public because experience and logic tell us they can be

---

[45] We have never performed a *Gunwall* analysis to determine if our article I, section 10 provides greater protection than its federal analogue, the First Amendment right of public access to judicial proceedings. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). However, it is not necessary to do a *Gunwall* analysis where we apply "established principles of state constitutional jurisprudence." *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982 (1998) ("Once we agree that our prior cases direct the analysis to be employed in resolving the legal issue, a *Gunwall* analysis is no longer helpful or necessary."). That is the case here, so no *Gunwall* analysis is required. *E.g., Rufer*, 154 Wn.2d at 549 (concluding that article I, section 10 gives us "good reason to diverge from federal open courts jurisprudence").

closed. This is a contradiction. Either our courts are open or they are not.

¶184 Further, our case law does not support use of the experience and logic test. The test is similar to a so-called "triviality" or "de minimis" approach, which is used in the federal courts but which we have declined to adopt.[46] Under this approach, certain trivial closures do not implicate the public trial right. *See State v. Easterling*, 157 Wn.2d 167, 183, 137 P.3d 825 (2006) (Madsen, J., concurring) (collecting federal cases on the de minimis standard). In *Easterling*, we said a triviality approach would conflict with section 10's mandate that justice be open: "Application of this 'triviality' standard may be appropriate where a federal court room is fully closed because the United States Constitution, unlike our state constitution, does not contain the open administration of justice in all cases requirement that is contained in article I, section 10 of our state's constitution."[47] *Id.* at 180 n.12. Justice Chambers went even further in concurring in *Easterling*, stating, "I cannot agree that there could ever be a proper exception to the principle that a courtroom may be closed without a proper hearing and order." *Id.* at 186 (Chambers, J., concurring). We should reject the expe-

---

[46] The experience and logic test and the triviality approach appear to be identical in most important respects. Both limit the public trial right by declaring that some proceedings can be closed—either because they are de minimis or because experience and logic so dictate. The purpose and effect of each is the same. Indeed, the methodology of each is similar as well: the experience and logic test turns on whether the closure would offend the essential purpose of the public trial right, but so does the triviality approach. *State v. Easterling*, 157 Wn.2d 167, 183-84, 137 P.3d 825 (2006) (Madsen, J., concurring) ("[W]hether a particular closure implicates the constitutional right to a public trial is determined by inquiring whether closure has infringed the 'values that the Supreme Court has said are advanced by the public trial guarantee . . . .' " (internal quotation marks omitted) (quoting *Carson v. Fischer*, 421 F.3d 83, 92 (2d Cir. 2005))). The only distinction between the two approaches appears to be the "experience" prong.

[47] *Easterling* says in the next sentence: "Thus, arguably, there is room for concluding that a public trial right violation is de minimis or trivial where only a violation of the Sixth Amendment is asserted." 157 Wn.2d at 180 n.12. But this cannot be true of section 22. Our section 10 and section 22 jurisprudences are intertwined. *Bone-Club*, 128 Wn.2d at 259. The two rights are not the same and should not be conflated, but we must read section 22 in light of the requirement that justice be administered openly in all cases.

rience and logic test for the same reasons we have declined to adopt a triviality approach.

¶185 In addition, there are practical problems with identifying what constitutes "experience" under the test. It is not immediately clear how lawyers and judges will effectively research how courts functioned—what was open and what was not—when our constitution was adopted. There is likely to be precious little guidance available. Nor is it immediately clear how our "experience" *since* 1889 has any constitutional significance. It is simpler and more true to our constitution merely to say that all phases of judicial proceedings are presumptively open.

¶186 Finally, limiting the scope of our open courts clause undermines the efficacy of section 10. We must keep in mind that any limitations we place on openness in this case may also be applied to requests for access to the administration of justice in future cases. In the next case, a newspaper may be asking for access to a particular phase of trial. If we begin to close off the courtroom to one proceeding after another, we will diminish open access to courts and court records.

¶187 Corruption and manipulation can slip into any phase of the trial, even a phase that the lead opinion would consider outside the open administration of justice. We should preserve our commitment to open courts by rejecting the experience and logic test.

III. Resolving this case

¶188 Despite my disagreement with the lead opinion's approach, I agree with the lead opinion's result. I would require the defendant to object or satisfy RAP 2.5(a)(3) before he is entitled to a new trial for a public trial violation.[48]

---

[48] No objection is required, however, to appeal a courtroom closure of such an egregious nature that it " ' "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." ' " *State v.*

¶189 This approach recognizes that all phases of a trial are presumptively open but draws an important distinction between the right to open courts and entitlement to a certain form of relief (namely, a new trial). I would hold that any courtroom closure without a *Bone-Club* hearing violates the public trial right, but that a defendant is not entitled to a new trial unless the defendant either objected to closure at trial or can satisfy RAP 2.5(a)(3) by showing " 'practical and identifiable consequences in the trial of the case.' " *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

¶190 Sublett did not object to closure and has not satisfied RAP 2.5(a)(3). Accordingly, I agree with the lead opinion that his conviction should be affirmed.

¶191 By its terms, RAP 2.5(a) applies to all errors not objected to at trial: "The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right." We have regularly required RAP 2.5(a)(3) analysis anytime a party raises a constitutional error to which they did not object at trial. *See, e.g., Kirkman*, 159 Wn.2d at 926-27 (RAP 2.5(a)(3) analysis required where error affecting right to trial by impartial jury was raised for the first time on appeal); *State v. Clark*, 139 Wn.2d 152, 155-56, 985 P.2d 377 (1999) (RAP 2.5(a)(3) analysis required where error affecting confrontation clause rights was raised for the first time on appeal). This requires a showing that the error " 'had practical and identifiable consequences in the trial of the case' "; in other words, the defendant must show *actual prejudice* before an appeals court will review the issue. *O'Hara*, 167 Wn.2d at 98-100

---

*Momah*, 167 Wn.2d 140, 149-50, 217 P.3d 321 (2009) (alteration in original) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (quoting *Neder v. United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999))), *cert. denied*, 131 S. Ct. 160 (2010). This occurs, for example, when a full phase of trial is closed such as in *Bone-Club*, 128 Wn.2d 254, or *Easterling*, 157 Wn.2d 167.

(internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 935). RAP 2.5(a)(3) also requires a harmless error analysis. *Id.*

¶192 Justice Stephens's concurring opinion finds "alarming" my reliance on RAP 2.5 "[i]n the face of our clear precedent . . . ." Concurrence (Stephens, J.) at 143. But what is "alarming" is that the court has ignored RAP 2.5 in the context of open trial violations, ordering new trials for defendants who never objected to limited chambers voir dire and who cannot show any resulting prejudice. Justice Stephens's reference to "our clear precedent" might lead the reader to conclude that we have actually analyzed how RAP 2.5 applies in the public trial context. To the contrary, we have no clear precedent on point, only cursory, unexamined assertions. In *Bone-Club*, we reviewed a courtroom closure, brushing aside the lack of any contemporaneous objection without analysis: "We also note Defendant's failure to object contemporaneously did not effect a waiver. *State v. Marsh*, 126 Wash. 142, 146-47, 217 P. 705 (1923)." *Bone-Club*, 128 Wn.2d at 257. *Bone-Club* never even mentions RAP 2.5, let alone explains why the 1923 *Marsh* decision overrides our 1976 adoption of RAP 2.5 half a century after *Marsh*.

¶193 The closest we have ever come to analyzing this issue is a footnote in *Easterling*:

> We have the discretion to review an issue raised for the first time on appeal when it involves a "manifest error affecting a constitutional right." RAP 2.5(a); *see* RAP 13.4. A criminal accused's rights to a public trial and to be present at his criminal trial are issues of constitutional magnitude that may be raised for the first time on appeal. *See In re Pers. Restraint of Orange*, 152 Wn.2d 795, 800, 100 P.3d 291 (2004); *Bone-Club*, 128 Wn.2d at 257.

157 Wn.2d at 173 n.2. The footnote is a non sequitur; it states that an issue is a "manifest error affecting a constitutional right" by citing *Orange* and *Bone-Club*, which mention neither RAP 2.5 nor "manifest error."

¶194 Nor does *Marsh* justify disregarding our rules of appellate procedure. At the time *Marsh* was decided, RAP 2.5 did not exist, nor was there any parallel requirement in our case law that a defendant show prejudice before we would review an unobjected-to constitutional error. *See State v. Warwick*, 105 Wash. 634, 637, 178 P. 977 (1919) (citing *State v. Crotts*, 22 Wash. 245, 60 P. 403 (1900); *State v. Jackson*, 83 Wash. 514, 145 P. 470 (1915); *Eckhart v. Peterson*, 94 Wash. 379, 162 P. 551 (1917)). In other words, *Marsh* was consistent with the contemporaneous objection rule of its time. However, in 1976, this court adopted a completely rewritten set of rules, the Rules of Appellate Procedure. The newly adopted RAP 2.5(a)(3) required a showing of actual prejudice anytime a litigant wished to raise a constitutional issue not raised at trial. *See O'Hara*, 167 Wn.2d at 99. *Bone-Club* failed to recognize this significant difference and simply cited *Marsh* with no further analysis. *Bone-Club*, 128 Wn.2d at 257.

¶195 Applying RAP 2.5 is consistent with our past public trial cases as well, including *Bone-Club*, 128 Wn.2d 254 (1995); *Orange*, 152 Wn.2d 795 (2004); *Easterling*, 157 Wn.2d 167 (2006); and *State v. Brightman*, 155 Wn.2d 506, 122 P.3d 150 (2005). As I explain in detail in my dissenting opinion in *State v. Paumier*, 176 Wn.2d 29, 53-56, 288 P.3d 1126 (2012) (Wiggins, J., dissenting), RAP 2.5 was satisfied in those cases because the public trial error there was structural, and we presumed prejudice despite the lack of an objection. When an error is structural, it defies harmless error analysis. Further, it makes sense to presume prejudice despite the lack of an objection for structural errors because such errors necessarily render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Prejudice is inherent in a structural error. Thus, RAP 2.5 will always be satisfied in cases of structural error like *Bone-Club*, *Orange*, *Easterling*, and *Brightman*. However, we held in *Momah* that not all public trial errors are structural. 167 Wn.2d at 150-51; *see Paumier*, 176 Wn.2d at

53-56 (Wiggins, J., dissenting). And where an error is not structural, we must conduct a thorough RAP 2.5 analysis.

¶196 Just as troubling, Justice Stephens confuses the concepts of waiver and preservation of an issue for appeal. The two are not the same. A waiver is a deliberate choice to forgo a right. Waivers allow a defendant the freedom to choose one course of action versus another. By contrast, a failure to preserve an issue is sometimes deliberate and sometimes inadvertent.[49] And we generally do not know if the failure to preserve is deliberate or inadvertent because the choice—or inadvertent lack of choice—is generally not made of record. The purpose of requiring an objection is to promote judicial economy and efficiency, an entirely different purpose from the waiver doctrine. *See* 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5(a)(1), at 192 (6th ed. 2004); *see also Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983).

¶197 Requiring compliance with RAP 2.5 is not the same as saying the defendant "waived" the right to a public trial. There is no question of "waiver" here. RAP 2.5 is concerned with issue preservation. The only question here is whether the public trial right will be on equal footing with all other constitutional rights with respect to RAP 2.5 or whether it should be placed on a pedestal. I see no reason why the public trial right should be any different than every other constitutional right with respect to the clear parameters of our appellate rules.

---

[49] Justice O'Connor distinguished forfeiture from waiver in *United States v. Olano*:

> Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U. S. 458, 464[, 58 S. Ct. 1019, 82 L. Ed. 1461] (1938) . . . . Mere forfeiture, as opposed to waiver, does not extinguish an "error" under [Fed. R. Crim. P.] Rule 52(b). . . . If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely objection.

507 U.S. 725, 733-34, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).

¶198 Our failure to adhere to RAP 2.5(a)(3) leads to unjustifiable consequences. In many situations, the defendant and defense counsel might willingly consent to closing part of a trial or indeed might prefer it. Both the prosecution and the defense may benefit from a closure, but it provides an interesting win-win for the defense. If the judge or the prosecution suggests closing part of a trial, the defense can remain mute and obtain the benefits of closure while nursing a secret life preserver virtually guaranteeing a successful appeal. Indeed, under Justice Stephens's analysis, the defendant has the benefit of an issue that is not subject to RAP 2.5(a)(3), requires no showing of actual prejudice, and is not subject to harmless error analysis. We need not even assume that the defense will resort to manipulation on this issue. The defense gains the same benefit even if defense counsel is unaware that a *Bone-Club* analysis is necessary.

¶199 Our failure to apply RAP 2.5(a)(3) to a public trial violation is at odds with a basic sense of fairness. *State v. Rinkes*, 70 Wn.2d 854, 859, 425 P.2d 658 (1967) ("The general rule is that one cannot voluntarily elect to submit his case to the jury and then, after an adverse verdict, claim error which, if it did exist, could have been cured or otherwise ameliorated by some action on the part of the trial court." (citing *State v. Perry*, 24 Wn.2d 764, 167 P.2d 173 (1946))); *State v. Case*, 49 Wn.2d 66, 72, 298 P.2d 500 (1956). It does not make sense to say that the defendant can silently consent to closure, then claim on appeal that the closure was constitutional error.

¶200 Finally, we have never explained any historical or legal basis for placing the right to public trial on a pedestal by skipping the RAP 2.5(a)(3) analysis that applies to so many other constitutional rights. Consider some of the other rights under article I, section 22. The defendant has the right to self-representation but must ask to exercise the right; the trial court is not required to advise the defendant of the right. *State v. Solis Garcia*, 92 Wn.2d 647, 600 P.2d 1010

(1979). The defendant has a right to a speedy trial but waives the right by failing to raise it. *State v. Green*, 70 Wn.2d 955, 425 P.2d 913 (1967). Defendant's waiver of the state constitutional right to testify must be made knowingly, voluntarily, and intelligently, but the trial court need not obtain an on-the-record waiver by defendant. *State v. Robinson*, 138 Wn.2d 753, 982 P.2d 590 (1999). These constitutional issues seem as important as the right to a public trial, but a contemporaneous objection or a showing of prejudice is required to pursue the right on appeal.

¶201 I conclude that the same must be true of the public trial right. A defendant who raises a public trial violation for the first time on appeal must comply with RAP 2.5(a)(3) by showing that the violation actually prejudiced the defendant: that the asserted error had " 'practical and identifiable consequences in the trial of the case.' " *O'Hara*, 167 Wn.2d at 99 (internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 935). The court will consider the error only after such a showing. If the court determines there has been a constitutional violation that actually affected the defendant's rights, the burden shifts to the state to show that the error was harmless beyond a reasonable doubt. *Id.* Of course, if the defendant had objected at trial, the error would be preserved for appeal and RAP 2.5(a)(3) analysis would be unnecessary. For these reasons, I concur in the lead opinion's result.

Motions for reconsideration denied February 8, 2013.